**UNITED STATES, ex rel., Leocadio BARAJAS, et al., Plaintiffs,**

v.

**NORTHROP CORPORATION, Defendant.**

No. CV 87–7288 KN (Kx).

United States District Court,
C.D. California.

May 9, 1995.

John T. Boese, Douglas W. Baruch, Shannon L. Haralson, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., William A. Molinski, Fried, Frank, Harris, Shriver & Jacobson, Los Angeles, CA, for Defendant Northrop Corporation.

Phillip E. Benson, Law Offices of Phillip E. Benson, Newport Beach, CA, Donald R. Warren, Monaghan & Strauss, San Diego, CA, for Plaintiff Leocadio Barajas.

ORDER RE: DEFENDANT'S RENEWED MOTION TO DISMISS THE FIRST AMENDED COMPLAINT & SEVERED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION

KENYON, District Judge.

After carefully reviewing the Ninth Circuit's instructions and the parties' papers, this Court DENIES defendant Northrop's renewed motion to dismiss plaintiff Leocadio Barajas's ("Barajas") first amended complaint and severed complaint for lack of subject matter jurisdiction.[1]

1. The Court also DENIES the parties' request for oral argument as unnecessary. *See, e.g., Soma-*

## I. *Factual And Procedural Background*

On July 15, 1987, Northrop test technician Barajas met with Air Force Office of Special Investigations ("OSI") Agent Ed Kopfle ("Kopfle"). Barajas reported that falsification of test data had been ongoing at Northrop's Western Service Division ("Northrop–WSD") in California. The alleged false testing involved the Flight Data Transmitter ("FDT"), a critical component of the Air Launched Cruise Missile ("ALCM") guidance system.

The ALCM was designed to be launched from the wings of B–52 aircraft in arctic regions at altitudes of 32,000 feet or more, where severe sub-zero temperatures prevail. Because of these launch conditions, the contract between the prime contractor, Boeing Aircraft Company ("Boeing") and the United States Air Force required the FDT to function at −65° F. Boeing subcontracted with Northrop to produce and test the FDTs, and between 1980 and 1986, over 1,700 FDTs were produced and incorporated into Boeing's cruise missiles. It was Northrop's responsibility to conduct Product Reliability Verification Tests ("PRVT"), which involved testing the operation of the FDT at temperature extremes of −65° F to +170° F. Barajas reported that when a unit failed testing, tapes falsely indicating a successful pass were routinely substituted in place of the accurate test data and the failed unit was then shipped to Boeing. Barajas informed OSI Agent Kopfle that even though this problem had been brought to the attention of Northrop management, it was being ignored.

On February 6, 1987, Barajas provided additional information to Kopfle concerning the test equipment used during PRVT—specifically, a Temperature–Vibration Cycler furnished by the Air Force but modified by Northrop to test FDTs. Four FDT units could be tested simultaneously and each test ran continuously for three days. The testing consisted of "freezing, heating, power up/ down and spin rotation of the FDT." *Decl. of Warren, Info. Report by Kopfle,* Exh. 10, at 144. Barajas indicated that most of the failures occurred during the first power start-up subsequent to each unit being exposed to sub-zero temperatures. *Id.*

On October 30, 1987, Barajas[2] filed his initial *qui tam* complaint pursuant to the False Claims Act. In that complaint, Barajas alleged that Northrop had knowingly falsified the tests of the FDTs and that the FDTs contained "substandard ... components, subject to failure under the performance extremes contemplated by applicable engineering standards." *Barajas Memo. in Support,* at 4:18–20 (citing original Complaint, Count 6).[3]

After substantial investigation, the government intervened in the underlying action on February 15, 1989. The government subsequently filed a first and a second amended complaint pursuing Barajas's allegation of falsified testing of the FDTs. However, the government's complaints did not include any specific allegations that the FDTs were themselves defective, that they contained substandard components, or that they could not perform within the specified temperature range.

---

*via v. Las Vegas Metropolitan Police Dep't,* 816 F.Supp. 638, 643 (D.Nev.1993), *aff'd without op.,* 15 F.3d 1089 (9th Cir.1994) (noting that, along with legal memoranda, oral argument is not evidence and does not create issues of fact) (citation omitted).

**2.** Barajas's co-plaintiff in the original *qui tam* complaint, Patricia Meyers, is not a party to this action. Northrop contends that Barajas's allegation that Northrop used "sub-standard parts and components" contradicts his counsel's earlier statement that this allegation was made solely by Meyers. *See Northrop Memo.,* at 22:9–23:20. Even if this is the case, Barajas's current motion is to amend his original complaint so as to include this allegation. In addition, he need only

prove that the information he provided the government "played some part" in the actual discovery of the damping fluid problem. *See infra* Section II(A)(4).

**3.** Northrop also argues that because Barajas separated his allegation of falsified testing from Meyers's general allegation regarding substandard components in an opposition to Northrop's jurisdictional challenge regarding Meyers, he has given up his claim related to the DC 200 damping fluid fraud. However, as Barajas is now trying to *add* the specific allegation regarding the DC 200 damping fluid to his original complaint, whether he initially made a general allegation charging Northrop with fraudulent use of substandard components is irrelevant.

The government also conducted a separate and distinct criminal investigation that resulted in the criminal indictment of Northrop. The government tested the FDTs and determined that the cause of the FDT failures at sub-zero temperatures was the DC 200 damping fluid used in the FDT gyroscopes. This damping fluid would freeze at temperatures well above the required −65° F, thus rendering the FDT inoperative. The first superseding criminal indictment, issued on June 27, 1989, alleged both testing/inspection and fluid cold temperature fraud. In exchange for the dismissal of the defective component accusations, Northrop pleaded guilty to several counts of the false testing allegations and agreed to pay criminal fines and penalties of approximately $8 million.

On August 17, 1990, Barajas moved to sever the unadopted and personal claims of his original complaint from the Government's civil complaint, and on November 19, 1990, this Court granted that motion. Barajas then filed an amended complaint that included allegations of damping fluid fraud virtually identical to those alleged by the government in its criminal indictment. On August 29, 1991, Northrop moved to dismiss Barajas's amended complaint pursuant to 31 U.S.C. § 3730(e)(4), contending that Barajas was not the source of the specific allegation that the DC 200 damping fluid was the defective component of the FDTs.

On December 20, 1991, this Court issued its memorandum decision and order dismissing Barajas's first amended and severed complaint. Critical to the Court's decision was the predicate finding that the April 1989 criminal indictment constituted a "public disclosure" within the meaning of the statute, and that the allegations concerning the damping fluid contained in Barajas's complaint were based upon this public disclosure. Since this Court felt that Barajas had not provided the Government with specific information regarding the DC 200 damping fluid prior to filing his initial complaint, the Court found that he was not an "original source" and that the Court lacked jurisdiction over his action. *District Court's Memorandum Opinion & Order Re: Northrop's Motion to Dismiss,* at 9–10 ["*Opinion*"].

The dismissal order was appealed to the Ninth Circuit and was set aside. *United States ex rel. Barajas v. Northrop Corp.,* 5 F.3d 407 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). Consequently, the appellate court remanded with directions for this Court to conduct appropriate factual inquiry based upon further discovery.

■ The Court allowed the parties approximately six months in which to conduct their discovery and submit their memoranda and evidence on this threshold jurisdictional issue.

## II. *Legal Analysis*

To amend his complaint to include an allegation regarding deficient damping fluid, Barajas must demonstrate either that the information was not "publicly disclosed" within the meaning of the [False Claims] Act despite its appearance in the indictment, or, if the information was "publicly disclosed," that he was "an original source" of that information.

*Northrop,* 5 F.3d at 409. In remanding this action, the Ninth Circuit set forth specific questions of fact about the "public disclosure" and "original source" determinations that this Court must first answer before determining whether it has subject matter jurisdiction over Barajas's amended complaint. The Ninth Circuit noted that "[a]s plaintiff, Barajas bears the burden of establishing jurisdiction." *Id.*

### A. *The Ninth Circuit Instructions*
#### 1. *"Public Disclosure"*

The Ninth Circuit recognized that Barajas did not have any specific knowledge that the damping fluid was substandard until after he left Northrop, and may have obtained this exact information from an article in the Los Angeles Times. *Id.* at 411. However, the court did not find this fact to be dispositive of the "public disclosure" issue under the Act. *Id.* The Ninth Circuit directed this Court to determine whether the "government's disclosure of the damping fluid allegations was the result of a criminal investigation that was instigated as a consequence of the informa-

tion Barajas provided to the government." *Id.* at 412. If this Court determines that the discovery of the alleged fraud was "prompted by a source of information wholly independent of Barajas," then the evidence Barajas now relies on amending his complaint was already publicly disclosed. *Id.* at 412 n. 11.

Relying on *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1416 (9th Cir. 1992), the Ninth Circuit held that "[e]vidence publicly disclosed for the first time during the discovery phase of a *qui tam* suit is not barred from use in that same suit by section 3730(e)(4)(A)." *Northrop*, 5 F.3d at 411. Although *Wang* dealt with the disclosure of information resulting from *civil*, not criminal, discovery, the *Northrop* panel did not draw any distinction between disclosure resulting from civil discovery by the government or a *qui tam* plaintiff, and that resulting from a criminal investigation by the government based on information provided by the *qui tam* plaintiff. *Id.* The court indicated that such a distinction would allow the government to limit the potential recovery of a *qui tam* plaintiff simply by initiating a criminal investigation, which is contrary to Congress's desire to uncover fraud by providing broad incentives for bringing *qui tam* suits. *Id.; see infra* notes 4 & 5.

### 2. *"Original Source"*

■ In its original ruling, this Court held that "to qualify as an 'original source,' the relator must have sufficient direct and independent knowledge of the fraud alleged to have taken place to support a claim under the False Claims Act.... Merely providing a lead which triggers an investigation does not qualify one as an 'original source.'" *Northrop*, 5 F.3d at 412. The Ninth Circuit found this to be too stringent a test.

In light of the language and history of the Act, the Ninth Circuit held that Barajas is "an original source" with respect to the

damping fluid fraud allegations if "he 'played some part', *whether direct or indirect*, in the public disclosure of the allegation of damping fluid fraud." *Id.* at 411 (emphasis added). In other words, Barajas does not have to prove that he informed the government specifically about the damping fluid fraud. Rather, this Court must determine whether the information supplied by Barajas triggered the criminal investigation that eventually led to the damping fluid allegations. If so, Barajas "played some part" in the public disclosure of those allegations, and he qualifies as an "original source." *Id.*

In reaching this conclusion, the Ninth Circuit first considered the language of the Act. The Act refers to *"an* original source," 31 U.S.C. § 3730(e)(4)(A) (emphasis added), which the Ninth Circuit read as suggesting the possibility that more than one original source may be eligible to bring suit. *Northrop*, 5 F.3d at 410. The Ninth Circuit also considered the language of the Act which provides that when a *qui tam* suit taken over by the government is "based *primarily* on the disclosures of specific information" for which the plaintiff was *not* an original source, 31 U.S.C. § 3730(d)(1), the *qui tam* plaintiff is limited to 10% of the recovery. *Northrop*, 5 F.3d at 410 (emphasis added).

The Ninth Circuit then looked to the legislative history of the Act. It held that the intent of the Act was to provide standing for *qui tam* plaintiffs who provide *some* of the information related to the claim even if the essential elements were already publicly disclosed, or provided by the government or someone other than the *qui tam* plaintiff.[4] The Ninth Circuit held that Congress intended to reward *qui tam* plaintiffs who bring actions even if the action is based almost entirely on information of which they did not have independent knowledge.[5]

---

4. Representative Berman, the House sponsor, stated that, "[a] person is an original source if he had *some* of the information related to the claim which he made available to the government ... in advance of the false clams being publicly disclosed." *Northrop*, 5 F.3d at 410 (citing 132 Cong.Rec. 29322 (Oct. 7, 1986) (emphasis added)).

5. According to Senator Grassley, who sponsored the Act and chaired the subcommittee that drafted it, the purpose of the "original source" and 10% amendments was to

    limit the possible portion of the judgment recoverable by a qui tam plaintiff to 10 percent or less *when the action is based primarily on public information.* This limitation will affect those persons who have brought a qui tam

### 3. Factual Determination Of "Public Disclosure" And "Original Source" Are Essentially The Same In This Case

■ The two factual questions posed by the Ninth Circuit are essentially the same in this case as both turn on whether the government's criminal investigation, which led to the source of the damping fluid allegations, was instigated in response to Barajas's disclosure or whether that discovery was prompted by a source of information wholly independent of Barajas. *Id.* at 411.[6] Accordingly, if this Court determines that the government's investigation was either the direct or indirect result of Barajas's "whistleblowing," then Barajas qualifies as an "original source" and the information was not "publicly disclosed."

### 4. Barajas Need Not Prove Direct Knowledge Of The Damping Fluid Allegations

Northrop argues that Barajas's failure to mention anything about the DC 200 damping fluid in his disclosure to the government precludes him from being an original source of this information; however, this argument was explicitly rejected by the Ninth Circuit. *Northrop,* 5 F.3d at 410. Northrop contends that the problems observed by Barajas during the Northrop–WSD tests were completely unrelated to the damping fluid problem such that Barajas's information could not have been the basis of the government's fraud allegations. Northrop relies on the expert testimony of two Northrop engineers who maintain that the tests conducted by Barajas did not allow the damping fluid sufficient time to "freeze,"[7] and hence the start-up problems observed by Barajas[8] must have been caused by the problems in the gyro itself or some other component. *Northrop Reply,* Exh. 3, *Joint Decl. of Farmer & Gilbertson,* at 26–29. Based on this information, this Court initially accepted Northrop's assertion that Barajas had no "direct" knowledge that the DC 200 damping fluid failed to meet government specifications. *Memorandum Opinion,* at 8–9.

Interestingly, the Ninth Circuit accepted this Court's original finding that Barajas had no direct knowledge of the damping fluid problem at the time of his disclosure. *Northrop,* 5 F.3d at 411. Nevertheless, on remand, the Ninth Circuit instructed this Court to focus on whether Barajas's information "played a part" in the government's discovery of the damping fluid fraud. *Id.* Thus, the Ninth Circuit clearly contemplated the possibility that Barajas could be an "original source"—even if he did not have direct knowledge of the damping fluid allegations—as long as Barajas's information indirectly led to the discovery of these allegations.

Northrop's reliance on *United States ex rel. Fine v. Chevron, U.S.A., Inc.,* 39 F.3d 957 (9th Cir.1994), is misplaced. In *Fine,* the plaintiff conceded that his allegations of false claims had been publicly disclosed within the meaning of § 3730(e)(4)(A). *Id.* at 961. But because Fine's original disclosure had at least indirectly led to the discovery of the further information, his claim was not barred by the statute. The *Fine* court specifically affirmed the holding in *Wang* when it stated that "*all* those who 'directly or indirectly' disclose an allegation might qualify as its

---

action *based almost entirely on information of which they did not have independent knowledge but had derived from a public source.* *Northrop,* 5 F.3d at 411 (citing 132 Cong.Rec. 20536 (Aug. 11, 1986) (emphasis added)).

6. "Indeed, the two questions may turn out to be essentially the same in this case." *Id.*

7. "Technically speaking, the fluid would not 'freeze' at extreme cold temperature, but would, in fact, become extremely viscous to the point where it would be virtually solid." *Northrop Reply,* Exh. 3, *Joint Decl. of Farmer & Gilbertson,* at 88, ¶ 4.

8. Northrop's experts explain that the gyroscope wheel is contained within a metal sphere called a gimbal. Although the gimbal is surrounded by the damping fluid, there is no damping fluid within the gimbal. The gyroscope wheel spins on its axis; however, the gimbal itself does not spin, but rather oscillates rotationally on its axis to a very limited degree. This oscillation is smoothed out by the damping fluid. The experts maintain that the damping fluid freeze and start-up problems are technically unrelated; i.e., the damping fluid could freeze and the gyro wheel could be free to spin and experience no start-up problem, or the fluid could remain liquid and the gyro wheel could potentially experience a start-up problem. *Id.*

original source." *Fine,* 39 F.3d at 962 (quoting *Wang,* 975 F.2d at 1419).

The same situation exists in this case. Barajas contests the prior public disclosure of his information, but even if the information had been publicly disclosed by the criminal indictment or the *Los Angeles Times,* Barajas asserts that he played some part in the disclosure. If Barajas is correct, this Court will have subject matter jurisdiction under the Ninth Circuit's remand order.

## B. *Results Of The Additional Factual Inquiry*

The Court makes the following factual findings based on the evidence submitted by the parties.

### 1. *Sequence of Events*

The following time-line most completely describes the course of events regarding the government's investigation of Northrop's alleged improprieties from the time of Barajas's initial contact with government investigators until the filing of the criminal indictment against Northrop. Unless otherwise noted, all exhibits refer to those lodged along with the *Declaration of Donald R. Warren* filed on behalf of Barajas.

On January 15, 1987, Barajas met with OSI Agent Kopfle, described the test falsification, and delivered four falsified FDT testing tapes. *Info. Report by Kopfle,* Exh. 10, at 143–45. On February 6, 1987, Barajas again met with Agent Kopfle and stated, "[M]ost of the failures occur during the first power start up subsequent to each unit being exposed to sub-zero temperature." *Id.* at 144. On March 7, 1987, Kopfle traveled to Seattle to pick up four FDTs for testing. *Kopfle Sequence of Events,* Exh. 11, at 147. The next day, he delivered these FDTs to Warner Robins Air Force Base ("WR–ALC") in Georgia for testing and informed the staff that the OSI had received allegations that Northrop–WSD had improperly tested FDTs and falsified test results. *Floyd Depo.,* at 32:3–52:20. Agent Kopfle also informed personnel at Tinker Air Force Base ("Tinker") in Oklahoma about the falsified test results. This is the first time Tinker engineer Mark Rosborough had heard of Northrop's testing improprieties. *Rosborough Depo.,* at 146:19–25. The first four FDTs were tested at WR–ALC in April 1987 and all failed. *DOD Inspector General, DCIS Report of Investigative Activity,* Exh. 13, at 166, ¶ 7. In June 1987, it was subsequently determined that the test parameters used were too stringent and the tests were declared invalid. *Id.* As a result, the Air Force decided to do a comparison of the tests done at Northrop–WSD and those at WR–ALC ("testing correlation"). *Rosborough Depo.,* at 148:2–23.

At an August 25–26, 1987 meeting regarding the FDT test analysis, Assistant U.S. Attorney ("AUSA") Crossan Anderson briefed all participants on the legal aspect of the criminal/civil cases against Northrop. *Minutes of ALCM FDT Test Analysis Meeting on Aug. 25–26, 1987,* Exh. 14, at 169, ¶ 4. It was decided that Tinker would establish a formal test format and would support testing required by the OSI and the U.S. Attorney's Office. *Id.* at 170, ¶ 11. Boeing's understanding that the "falsification took place on the HOT–COLD test" was recorded in the minutes of a September 29–30, 1987 meeting regarding the FDT test analysis. *Minutes of ALCM FDT Test Analysis Meeting on Sept. 29–30, 1987,* Exh. 15, at 172, ¶ 9. According to Rosborough, who had been trouble-shooting the FDT problem since the ALCM investigation started, the gyro freezing problem had surfaced at WR–ALC only after the new cold-soak testing procedures were implemented. *Info. Report by Kopfle,* Exh. 16, at 174, ¶ 3.

On November 19, 1987, Colonel David T. Howe of Material Management Headquarters at Tinker issued a memo labeled "Subject: ALCM Flight Data Transmitter (FDT) Test Requirements." This memo stated that a concern "arises as a result of the allegations that the FDTs were not properly tested by the Northrop Corp." and provided a test setup which was to consist of "[a]n environment chamber capable of housing an FDT and developing temperatures of minus 65° F and +170° F." *Howe Memo.,* Exh. 17, at 175–76.

The old method of testing at WR–ALC consisted of lowering the ambient air temperature around the FDT to −65° F and then

beginning the test. *Rosborough Depo.*, at 149:12–22. WR–ALC had been routinely repairing and testing FDTs in service in the field since 1985. *Northrop Memo. in Support of Renewed Motion*, Exh. 2, at 111. Under the old method, however, it was found that the actual temperature of the FDT was only −45° F and still cooling at the time testing began. Consequently, the test was modified to include a "cold soak" that guaranteed the FDT was at −65° F at the time testing began. *Rosborough Depo.*, at 149:8–22. This cold soak test was a result of the "test correlation" between the WR–ALC and Northrop test. *Id.*[9] As a result of the new cold soak tests on the FDTs done at WR–ALC in April and May 1988, it was discovered that the DC 200 damping fluid used in the FDT was freezing at −65° F. *Id.; DOD Inspector General, DCIS Report of Investigative Activity*, Exh. 13, at 166, ¶ 8. On or about June 2, 1988, Rosborough read the DCIS report, became fully aware of the freezing gyros in the WR–ALC cold soak testing, and informed other Tinker personnel. *Id.*, at 167, ¶ 10. According to Rosborough, this was the first time anyone in the Air Force realized that the damping fluid was freezing at −65° F. *Rosborough Depo.*, at 150:19–23.[10] From June 8–9, 1988, Agent Kopfle subsequently conducted interviews with Charles Hopkins, Rosborough's supervisor; Donald Floyd, WR–ALC FDT supervisor; and Bobby Mitchell, Tinker ALCM Program Manager regarding the problems with the damping fluid as a part of Kopfle's investigation of the Barajas allegations. *Kopfle Depo.*, at 66:18–67:23.

In August 1988, Agent Kopfle turned over the Barajas investigation case file to a Criminal Task Force. *Kopfle Activity Summary*, Exh. 21, at 188. On October 3, 1988, the Department of Defense issued a subpoena duces tecum directed to Northrop seeking information pertaining to the use of DC 200 fluid in FDT gyros. The subpoena directed Northrop to produce all documents and records from the Northrop–PPD division in Massachusetts—the manufacturing site of the FDTs—pertaining to the use and acquisition of DC 200 fluid. *Subpoena Duces Tecum*, Exh. 22, at 189–195. In a letter dated November 14, 1988, addressed to Gen. Alford Hanson at Wright–Patterson AFB, AUSA Howard Daniels and AUSA William Fahey stated:

> Our office has been conducting criminal and civil investigations regarding Northrop Corporation's failure to conduct required testing of the flight date transmitters (FDT) which are a central component of the Air Launch Cruise Missile. Simultaneously, the Air Logistics Center at Tinker Air Force Base has been addressing the issue of fleet testing to evaluate the extent to which the FDT's may be unreliable as a

9. The following questions and answers were taken from Mark Rosborough's deposition:

> Q. As a result of that investigation, was a decision made to begin including FDTs in the ACI testing program?
> A. Yes.
> . . . .
> Q. Okay. I've missed a step here. Was one of the outcomes of the investigation into the affect [sic] that the California testing improprieties might have on the overall success of the ALCM, a decision to look into what type of testing was done at the Northrop California plan and how that compared to the Warner Robins testing?
> A. Yes.
> Q. And that was the testing correlation that you've talked about today?
> A. Yes.
> . . . .
> Q. Was an outcome of the correlation test testing analysis a decision to begin doing cold soak testing of the FDTs at Warner Robins?
> A. Say that again, please.
> Q. Sure. Was an outcome of the correlation test analysis a decision to begin doing cold soak testing at minus 65 degrees at Warner Robins?
> A. Yes.

*Rosborough Depo.*, 148:2–149:11.

10. Rosborough met with Northrop chemist Duncan and senior engineer Smeltzer on June 28, 1988 at the Northrop–PPD site in Massachusetts at which time Duncan and Smeltzer informed Rosborough that "Northrop could only guarantee the gyros to −40° F, and anything below −45° F would definitely cause the gyros to freeze." *DOD Inspector General, DCIS Report of Investigative Activity*, Exh. 13, at 167, ¶ 14. When Rosborough related this to Dick Gilbertson, Northrop test equipment manager, and informed him that the contract specification required the FDT to function at −65° F, Gilbertson replied, "Cut the shit, we both know it will freeze at −65° F." *Id.*, at 168, ¶ 15.

result of Northrop's falsified testing. A critical issue that has emerged is whether the gyros in the FDT's 'freeze' at cold temperatures....

*Daniels & Fahey Letter,* Exh. 23, at 197.

This statement summarizes the reason for the testing at Tinker and WR–ALC. Tinker was addressing the issue of fleet testing *"as a result"* of Northrop's falsified testing. *Id.* A critical issue *"emerged"* from this investigation: the discovery that the damping fluid was freezing the movement of the gyros. *Id.* The FDT failure was determined at that time to be caused by the freezing of the DC 200 damping fluid, which is the basis of Barajas's amended complaint.

**2. *Northrop's Argument About The Difference In Tests At Northrop And WR–ALC Is Unavailing***

While the fact that WR–ALC had been testing FDTs since 1985 is not contested, Northrop maintains that the WR–ALC testing which led to the discovery that the damping fluid would freeze at −65° F was routine. Northrop also argues that the tests conducted at Northrop and WR–ALC used different parameters and software. As a result, Northrop contends that the WR–ALC discovered the damping fluid fraud wholly independent of any information Barajas could have offered.

The Court disagrees; the testing that revealed the damping fluid would freeze at −65° F was *not* routine. The damping fluid freezing was not discovered until the routine tests conducted at WR–ALC were *changed* to allow for a "cold-soak" of the FDTs before the actual testing began. Thus, the relevant inquiry is *why* these testing procedures were changed. The evidence clearly reveals that,

at Rosborough's behest, the WR–ALC's procedures were changed in the spring of 1988 to include the cold-soak process. *Rosborough Depo.,* at 120:21–121:22. The WR–ALC personnel did not independently decide to change their testing procedures and then coincidentally discover the damping fluid freezing problem.[11] Rather, this test change, which was initiated by Tinker personnel based on Barajas's information,[12] led to the discovery of the damping fluid problems. *Floyd Depo.,* at 54:4–55:5; *Rosborough Depo.,* at 150:4–18.

In an attempt to show that the tests conducted at WR–ALC were unrelated to the Barajas investigation conducted by the U.S. Attorney's Office, Northrop references a letter from Col. Thomas Hruskocy, Director of the Material Management at Tinker, to the U.S. Attorney's Office. *Northrop Reply,* Exh. 2, *Hruskocy Letter,* at 85 ("Third, until [AUSA Robert C. Bonner's] 8 Jul[y] 88 letter, we were not informed that your investigation extended beyond production testing of the FDTs."). However, the Court cannot discern the context of this letter as it has not been provided a copy of Bonner's original correspondence. More importantly, even if Hruskocy's statement implies that the Tinker personnel did not know that the criminal investigation extended beyond the production testing, this statement still does not prove that the WR–ALC discovery of the damping fluid fraud was wholly independent of Barajas's information. As long as Barajas's information caused WR–ALC's discovery of the fraud, then Barajas was an "original source". As stated earlier, the crucial issue is why Tinker decided to modify the tests done at WR–ALC. Thus, Col. Hruskocy's personal

---

**11.** Northrop claims that the change in the interpretation of the WR–ALC testing procedure was not directed or authorized by the criminal investigators. *Northrop Memo.,* at 14:17–18 (relying on *Kopfle Depo.,* at 28:18–28). Even if this is true, Rosborough admits that *he* directed the testing change in the spring of 1988. *Rosborough Depo.,* at 120:21–121:22. At the very latest, Rosborough knew of Northrop's alleged damping fluid fraud and the criminal investigation in September 1987, the dates of the ALCM Flight Data Transmitter Test Analysis Meeting at Tinker. *See Minutes of ALCM FDT Test Analysis Meeting of Sept. 29–30, 1987,* Exh. 15, at 171–73.

**12.** The Tinker orders specifically stated that the changes were made out of concerns over the FDTs' performance in hot and cold temperatures arising "as a result of the allegations that the FDTs were not properly tested by the Northrop Corp." *Howe Memo.,* Exh. 17, at 175, ¶ 1. In a meeting at Tinker that led up to this decision, one factor considered was that the falsifications at Northrop took place on the HOT–COLD test. *Minutes of ALCM FDT Test Analysis Meeting on Sept. 29–30, 1987,* Exh. 15, at 172, ¶ 9. This is the information originally provided by Barajas.

knowledge of the exact scope of the U.S. Attorney's specific investigation is irrelevant.[13]

### III. Conclusion

The factual inquiry the Ninth Circuit instructed this Court to consider on remand is limited to whether the government's discovery of the damping fluid fraud was the result of a criminal investigation that was instigated as a consequence of the information Barajas provided to the government. The sequence of events beginning with Barajas's disclosure and ending with the criminal indictment of Northrop clearly indicates that the government's investigation arose as a result of the information provided by Barajas. Accordingly, this Court finds that Barajas was an "original source" of the damping fluid information, which, as far as the amended complaint is concerned, necessarily means that this information was not "publicly disclosed." Therefore, the Court **DENIES** Northrop's renewed motion to dismiss the first amended complaint and severed complaint for lack of subject matter jurisdiction.

The Court **ORDERS** the parties to appear via telephonic status conference on June 12, 1995 at 11:30 a.m. to discuss how to proceed in this matter. Specifically, the Court intends to discuss all relevant pre-trial dates and motions [14] in an effort to streamline this case. The Court requests Barajas's counsel to set up the conference call. Any scheduling questions should be directed to Karla Tunis, the Court Clerk. IT IS SO ORDERED.

### ORDER RE: NORTHROP'S MOTION TO RECONSIDER OR CLARIFY ORDER; OR ALTERNATIVELY, TO AMEND ORDER TO ADD CERTIFICATION FOR INTERLOCUTORY APPEAL

Based on the papers submitted, the Court **RULES AS FOLLOWS:** [1]

(1) The Court **DENIES** Northrop's motion to reconsider the Court's May 9, 1995 ruling that the Court has subject matter jurisdiction over this action because relator Barajas was an "original source" of the damping fluid information;

(2) the Court **CLARIFIES** certain factual portions of the May 9, 1995 order as set forth below; and

(3) the Court **DENIES** Northrop's alternate motion to certify the May 9, 1995 order for interlocutory appeal.

The Court **ORDERS** the parties to appear via telephonic status conference on August 14, 1995 at 10:00 a.m. to discuss how to proceed in this matter. Specifically, the Court intends to discuss all relevant pre-trial dates and motions [2] in an effort to streamline

---

**13.** The same argument applies to Northrop's reliance on WR–ALC Logistics Manager Bobby Mitchell's memo to the file. Mitchell wrote that, "Our investigation centered around what method we should use to assure FDTs repaired at WR–ALC are tested properly. Involvement was limited to OC–ALC, WR–ALC and BA as the results were for depot testing and not for evidence in any criminal case." *Northrop Reply*, Exh. 5, *Mitchell Memo*, at 91, ¶1. However, Mitchell also reported that the WR–ALC personnel were "told that Northrop stated that the fluid in the gyros would 'freeze' if held at −65° F." *Id.* Furthermore, Mitchell's personal understanding of why the WR–ALC tests were conducted—i.e., to assure the reliability of the ALCMs—does not disprove the fact that Barajas's information at least indirectly caused the change in test procedures that led to the discovery of the damping fluid fraud.

**14.** For example, the Ninth Circuit also noted on appeal that even if this Court determines that it has jurisdiction over Barajas's amended com-

plaint, it must still consider whether Barajas is barred from making these claims because (1) he accepted the settlement of FDT testing issues between Northrop and the government, and (2) he brings this claim over the government's objections. *See Northrop*, 5 F.3d at 412. Northrop has reserved the right to fully brief these issues and will be given the opportunity to do so via a future motion.

**1.** The Court also **DENIES** Northrop's request for oral argument as unnecessary. *See, e.g., Somavia v. Las Vegas Metropolitan Police Dep't*, 816 F.Supp. 638, 643 (D.Nev.1993), *aff'd without op.*, 15 F.3d 1089 (9th Cir.1994) (noting that, along with legal memoranda, oral argument is not evidence and does not create issues of fact) (citation omitted).

**2.** For example, the Ninth Circuit also noted on appeal that even if this Court determines that it has jurisdiction over Barajas's amended complaint, it must still consider whether Barajas is

this case. The Court requests Barajas's counsel to set up the conference call. Any scheduling questions should be directed to Karla Tunis, the Court Clerk.

## I. *Northrop's Motion To Reconsider Or Clarify Order*

In its May 9, 1995 order, the Court expressly found that "Barajas was an 'original source' of the damping fluid information, which, as far as the amended complaint is concerned, necessarily means that this information was not 'publicly disclosed.'" *5/9/95 Order* at 18 ("the Order").

In its motion, Northrop primarily contends that (1) this Order relied on certain factual findings which are not supported by the record and the Court did not address other material facts established by Northrop in the record; and (2) the Order did not clarify the legal standard of causation or "triggering" that it applied to the factual findings. *Northrop's Opening Memo* at 1.

Northrop's reconsideration motion fails procedurally and substantively. Procedurally, Northrop presents factual and legal arguments that were either raised or could have been raised in the prior motion. In addition, Northrop has not made a manifest showing that the Court failed to consider any material facts pertinent to the Court's ultimate conclusion that its jurisdiction is sound. On these grounds alone, Northrop's reconsideration motion fails.[3]

More importantly, however, there is no substantive basis for Northrop's request that the Court reverse its holding that Barajas was an "original source." First, the material facts found by the Court are supported by the record and establish the Court's subject matter jurisdiction over this suit. And second, the Court need not engage in a protracted analysis of the legal standard of "proximate" versus "but for" "causation" that Northrop suggests; the Order's analysis of the Ninth Circuit's remand order and other relevant Ninth Circuit authority is sufficient.

### A. *The Material Facts Found By The Court Are Supported By The Record And Establish Jurisdiction*

Northrop asks this Court to "amend the Order to reflect the fact that there is no evidence in the Record to show (1) that [Tinker Air Force Base engineer Mark] Rosborough directed the key change in testing methodology in response to any Barajas allegation, (2) that the key change was part of, or was necessary to, the test correlation process, or (3) why Rosborough directed the change in test methods." *Northrop's Opening Memo* at 3.

The Court disagrees with Northrop's assertions. As painstakingly laid out in the Order, the uncontroverted evidence shows that Barajas reported FDT test falsification to OSI Agent Kopfle, Kopfle informed Warner Robins ("WR–ALC") and Tinker Air Force Base personnel of these allegations, Tinker conducted a Northrop and WR–ALC testing correlation which lead to the implementation of the "cold soak" test, and from there, the damping fluid freezing problem was discovered. *Order* at 11–15. In support of this timeline, the Court cited a variety of documentary and testimonial evidence, including various government reports and min-

---

barred from making these claims because (1) he accepted the settlement of FDT testing issues between Northrop and the government, and (2) he brings this claim over the government's objections. *See United States v. Northrop Corp.,* 5 F.3d 407, 412 (9th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). Northrop has reserved the right to fully brief these issues and will be given the opportunity to do so via a future motion.

**3.** Local Rule 7.16 provides the basis upon which a court may reconsider its order:

A motion for reconsideration of the decision on any motion may be made only on the grounds of (a) a material difference in fact or law from

that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider such material facts presented to the Court before such decision. No motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion.

*See, e.g., Van Ryn v. Korean Air Lines,* 640 F.Supp. 284, 286 (C.D.Cal.1985) (citing Local Rule 7.16).

utes of meetings, as well as the deposition testimony of Rosborough and WR–ALC repair/testing supervisor Dan Floyd.

On this issue, Northrop primarily argues that: (1) the Court's reliance on the Howe memorandum is misplaced because the CBT testing referred to in the memorandum related to proposed field testing that was never carried out and was separate from the component testing conducted at WR–ALC; and (2) Rosborough's deposition testimony that the WR–ALC "cold soak" test was a result of the test correlation between WR–ALC and Northrop "does not show that the change in the cold temperature testing method had anything to do with the correlation process or any allegation by Barajas." *Northrop's Opening Memo* at 5.

The Court rejects both arguments. While it recognizes that the CBT test was never carried out, the Court cited the Howe memorandum to show that several Tinker personnel knew the importance of testing the FDTs at the proper temperature "as a result of the allegations that the FDTs were not properly tested by the Northrop Corp." *Order* at 16 n. 12 (citing *Howe Memo.*, Exh. 17 to *Warren Decl.*, Exh. 17, at 175, ¶ 1). In addition, the Court acknowledges that while the Howe memorandum discussed a test unrelated to the WR–ALC tests, this does not change the Court's conclusion that, based on Barajas's information, "cold soak" testing adopted by WR–ALC led to the discovery of the damping fluid problems. *See Floyd Depo.*, at 54:4–55:5; *Rosborough Depo.*, at 150:4–18.[4]

As to the Rosborough testimonial evidence,[5] the Court rejects Northrop's contention that unless Rosborough specifically stated that the "cold soak" testing method was a result of Barajas's allegations, Barajas was not an original source. As a practical matter, Rosborough would probably not make such an explicit statement, and as a legal matter, such a direct statement is not necessary given the Court's findings as to the specific sequence of events linking Barajas's

allegations to the discovery of the damping fluid fraud. Indeed, Rosborough admitted in his deposition that the decision to "cold soak" the FDTs at minus 65 degrees at WR–ALC was "based on the correlation testing and seeing how we were going [sic] things versus what the specs said or the test procedure said." *Rosborough Depo.* at 156:16–22. This, along with the other documentary and testimonial evidence mentioned here and in the Order, provides the necessary link between Barajas's original allegations and the government's discovery of the damping fluid fraud. *Order* at 11–17.

Nonetheless, the Court wishes to clarify its position on several minor factual points raised by Northrop in its papers:[6]

First, Northrop objects to what it characterizes as a "finding" by the Court that Boeing and the U.S. Air Force required the FDT to function at −65 degrees. *Order* at 2. However, a careful reading of the Order shows that this "fact" was included by way of providing background information and that the specific findings regarding jurisdiction begins on page 11. *Id.* at 11 ("The Court makes the following factual findings based on the evidence submitted by the parties."). Thus, any facts not related to jurisdiction are not "findings" but are provided solely for informational and background purposes.

Second, the Court acknowledges the typing error on page 1 of the Order regarding the date on which Barajas met with the OSI; the correct date is January 15, 1987 as it appears in the factual findings section on page 11. Accordingly, the Court AMENDS the Order to change the "July 15, 1987" date on page 1 to "January 15, 1987."

Third, the Court **AMENDS** the Order at page 16, footnote 11, line 21 to change "damping fluid fraud" to "temperature performance problem"; the minutes of the September 29–30, 1987 meeting cited in the footnote support this change.

---

4. In light of this clarification, the Court does not agree that it needs to amend its order regarding its citation of the Howe memorandum, as suggested by Northrop. *See Northrop's Opening Memo* at 4 (discussing Finding 1) & 6–7 (discussing Finding 3).

5. *See Northrop's Opening Memo* at 5 (discussing Finding 2).

6. *See Northrop's Opening Memo* at 7–8 (discussing Findings 4–7).

And fourth, the Court **AMENDS** the Order at page 15, line 1 to change "FDTs" to "FDT gyroscopes." The Court rejects Northrop's suggestion that the Order be amended to specifically reflect that the subpoena at issue "was part of an omnibus Task Force subpoena of Northrop relating to at least three investigations distinct from the FDT claims raised by Barajas." *Northrop's Opening Memo* at 8. Whether there was a larger investigation of Northrop is irrelevant to the narrow issue of whether this Court has subject matter jurisdiction over this case because Barajas's allegations played some part in the discovery of the damping fluid allegations by the government.

B. *The Court Need Not Set Forth A Formulation Of The Causation Standard To Satisfy The "Original Source" Doctrine Beyond That Which Was Stated By The Ninth Circuit In Its Remand Order*

Northrop next argues that the Court should clarify the legal standard the Order applied in determining that Barajas was an "original source." Specifically, Northrop asks the Court to "clarify whether the standard of causation it applies in answer to this question is a bare 'but for' causation standard or, instead, some more substantial standard of causation such as the proximate cause of tort law." *Northrop's Opening Memo* at 9.

In its Order, the Court spent over six pages carefully setting forth the Ninth Circuit's remand order in sufficient applies to the specific facts found by this Court. To do so, the Ninth Circuit would defer to these factual findings unless these findings were "clearly erroneous." *Northrop,* 5 F.3d at 409 n. 5. Accordingly, the Court finds the Order inappropriate for interlocutory appeal.

IT IS SO ORDERED.