Revised May 23, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-11483

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellant,

                    versus

UNITED STATES OF AMERICA,
ex relatione, PETER JENSEN THORNTON,

                                        Relator-Appellee,

                    versus

SCIENCE APPLICATIONS INTERNATIONAL
CORPORATION; BENDIX FIELD
ENGINEERING CORPORATION,
A Division of Allied Signal
Aerospace Company; LLOYD ELECTRIC
COMPANY, INC.,

                                        Defendants.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

March 28, 2000

Before POLITZ, JOHN R. GIBSON,[*] and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    This appeal presents the issue of how to value a False Claims

Act settlement when the settlement includes both cash and released

claims against the government.  The government appeals the district

court's determination that the award of the qui tam relator, Peter

_____

    [*] Circuit Judge of the Eighth Circuit, sitting by designation.

Thornton, should be calculated using both the cash value of the settlement and the court's estimate of the value of the defendants' released contractual claims against the government. We conclude that ordinarily the value of such released claims shall be added to any cash paid to the government in settlement for purposes of calculating the sum due the informant under the statute. The amount of such released claims shall be included when the released claims are part of the bargain of the settlement and are not so intertwined with the subject of the False Claims Act cause of action so as to present the equivalent of a compulsory counterclaim. We VACATE the award and REMAND, however, so that the district court may develop a record of how it determined that value.

I

Peter Thornton filed a False Claims Act ("FCA") suit against several defendants relating to the installation of a government security system. The government opted to participate in the suit and settled with each of the defendants. The settlement included $230,000 in cash from the three defendants combined, the release of contractual claims the defendants had against the government, which they claimed had a value of $1.6 million, and the transfer of the system's software code to the government.

Thornton challenged the adequacy of the settlement, triggering the FCA's statutory fairness hearing. At that hearing, Thornton argued that the settlement did not take into account several

additional incidents of fraud. The district court, which at that time had not seen the settlement agreement, conditionally approved the settlement and rejected Thornton's objections. The court noted in passing that the parties had settled the defendants' claims as part of the settlement, but apparently this aspect was not a focus of the hearing. The court set a second hearing to determine Thornton's share.

In his briefing for the second hearing, Thornton argued that the total value of the settlement should take into account the defendants' administrative claims released by the government. He argued that the face value of the released claims should be added to the cash value of the settlement for a total of $1.83 million. He also argued that the software code had value to the settlement. The government contended that neither the released claims nor the software code should be considered part of the value.

The district court held that the released claims should be included but held that the software code was collateral to the settlement: its transfer had been provided for in the original contract, and its mention in the settlement agreement was simply for the parties' convenience. The parties dispute the procedure by which the district court arrived at its valuation of the released claims. Thornton reports that the district court examined documents withheld by the government as privileged in camera, including the contract documents, change orders, claims of the defendants, and the government's investigative report. The

3

government contends that the court simply split the face value of the claims in half. The record before us sheds no light on what procedure was used. The district court held that even if the value of the defendants' claims was half their face value, or $800,000, Thornton was entitled to all of the cash proceeds of the settlement if his share was 22.33 percent.

The court entered final judgment, at which point the settlements were accepted. The government appealed, claiming that the value of the released claims should not have been included, that the district court and Thornton were bound by their positions at the first hearing, and that the valuation of the released claims was clearly erroneous.

## II

The qui tam provisions of the False Claims Act create incentives for potential whistle blowers to assist the government to discover fraud against the taxpayers.[1] The FCA allows a private citizen with special knowledge of fraud against the government to commence suit in the name of the government.[2] The government may intervene in the action or allow the qui tam relator to proceed with the suit alone.[3] If the government intervenes, it may settle the case over the relator's objections as long as the settlement is

---

[1] See United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230, 233 (9th Cir. 1997).

[2] See 31 U.S.C.§ 3730(b)(1) (1999).

[3] See § 3730(b)(2).

4

fair, adequate and reasonable.[4]  The relator may request a hearing to review the fairness of the settlement.[5]

Upon settlement, the relator receives between 15 and 25 percent "of the proceeds of the action or settlement of the claim," depending on the value of his contribution to the recovery.[6]  We first address whether the value of the defendants' released claims against the government should be included in the settlement for purposes of calculating Thornton's share.  The parties agree that the "proceeds" of an FCA settlement may include non-cash value, such as the value of certain released claims.  Certain principles, however, confine when other settlements are relevant to the value of the FCA settlement for purposes of determining the relator's share.

First, for the value of the released claims to be included, there must be an indication that they were released in return for the government's release of the FCA claims.  For example, in <u>United States ex rel. Burr v. Blue Cross & Blue Shield of Florida, Inc.</u>, the court stated that it would not consider the "sums received" by the defendant in its settlement with the government and a third party.  Because the two settlements were paid separately, the

---

[4]<u>See</u> § 3730(c)(2)(B).

[5]<u>See id</u>.

[6]<u>See</u> § 3730(d)(1).

5

settlement of the defendants' claims was not set off against the value of the FCA settlement.[7]

Even if the different settlements are memorialized in a single agreement, there may have been no exchange of releases. In Thornton's case, the district court found that the transfer of the software code was not in return for the settlement of the FCA case because the government's contractual right to the code had not been in dispute. The defendants' claims against the government, in contrast, were part of the bargain of the settlement. It is clear from the settlement agreement and from the defendants' statements at the fairness hearing that the defendants' claims were released in exchange for the settlement of the FCA suit.

Second, latent claims against the government may be so intertwined with the government's FCA claim that the FCA suit triggers them as counterclaims.[8] In such instances, the government might well not have been exposed to liability had the FCA suit not been brought. The resulting settlement in such cases represents not so much a trading of valued claims but rather the sum total of the value of the litigation to the government. To base the share on the amount of released claims in this circumstance would leave

---

[7]882 F. Supp. 166, 169 (M.D. Fla. 1995).

[8]Such closely related claims correspond roughly to compulsory counterclaims under the Federal Rules of Civil Procedure. See FED.R.CIV.P. 13(a) (1999).

6

the relator in a better position than the government, the entity on whose behalf the suit was brought.

In Thornton's case, the released claims of the defendants do not meet these circumstances. The defendants had already filed their administrative claims by the time Thornton brought the FCA suit. Thus, the value of the claims, stated by defendants as having been part of the bargain of the settlement, is part of the value of the settlement in determining Thornton's share of the total proceeds.

## III

We turn to the procedural questions of how the valuation should occur for purposes of determining the relator's share. The government contends that the valuation of the settlement must be made at the fairness hearing before the settlement is finalized.[9] Here, Thornton first raised the issue of the released claims when the district court determined the relator's share.

---

[9]We are not persuaded by the government's argument that the district court was barred from considering the issue at the relator's share hearing under the law of the case. The law of the case speaks to reconsidering issues previously decided by the court. Free v. Abbott Lab., Inc., 164 F.3d 270, 272 (5th Cir. 1999). It is not apparent that the district court decided the same issue differently at the two hearings: at the first hearing, he determined what amount was adequate to settle given the claims; at the second hearing, he determined the value of the settlement for purposes of calculating Thornton's share. We are especially not eager to preclude the second ruling when the government had not provided the court with copies of the settlement agreement at the first hearing.

7

Under normal circumstances, the value of non-cash proceeds should be determined before the district court approves the FCA settlement. This sequence allows the government to withdraw from a global settlement whose net cash value, after subtracting the relator's share, the government deems too minimal. To achieve this end, a district court is free to advise the relator that the total value of the settlement will be determined when the court ascertains the fairness of the settlement, and that the relator must raise any objections at the fairness hearing. Such an approach also allows the court to evaluate the total value relative to the strength of the FCA claims, rather than in a vacuum, and allows the possibility of a single proceeding.

This approach does not prejudice the relator as long as he and the court are on notice of the components of the settlement and the government's estimate of any non-cash proceeds. The government has a duty to advise the relator of the value of the settlement at the time it notifies him that it intends to settle the case, and this representation should include the government's estimate of the value of non-cash proceeds. Especially in cases such as this one, in which the face value of the defendants' claims is significant, the government will have a rough idea of the claims' value.[10]

_____

[10]The value of some non-cash proceeds, such as the government's release of potential criminal liability or the defendant's agreement to provide additional services in the future, may not be ascertainable. Where no reasonable valuation is possible, it cannot be taken into account in calculating the relator's share.

Here, the relator received no estimate of the government's valuation of the released claims and was not advised that he must object to that value at the fairness hearing. Thornton was thus free to contest the value assigned by the government in his request for a share of the proceeds. It is unclear from the record, however, how the district court undertook to value the released claims: the opinion gives no explanation as to how the amount was reached, and the documents on which Thornton claims the court relied are not before us. We thus must remand for fuller development of the record.

On remand, the government should provide the district court with an estimate of the released claims and documentation supporting that estimate. As the relator is unlikely to have much, if any, information as to the value of such claims, he should be allowed access to as much as possible of the documentation. Ultimately, he bears the burden of disproving the government's estimate of value.

We note that this inquiry should not balloon into extensive collateral litigation. It comes as no surprise that while the government and relator have litigated on the same side, their interests diverge when it comes time to pay the relator's share. The government has not always been magnanimous to its relators at the end of the day.[11] They cannot easily part ways at this stage,

---

[11] See United States v. General Elec., 808 F. Supp. 580, 583-84 (S.D. Ohio 1992); Marc S. Raspanti & David M. Laigaie, Current

9

however:  the relator must rely to some extent on the government to report in good faith the fruits of their joint efforts.

VACATED AND REMANDED.

---

Practice & Procedure Under the Whistleblower Provisions of the Federal False Claims Act, 71 TEMP. L. REV. 23, 47–53 (1998).