**UNITED STATES of America, ex rel. Leocadio BARAJAS, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Northrop Corporation, Defendant.**

No. 99–55599.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 2000

Filed Aug. 3, 2001

Donald R. Warren, San Diego, California, and Phillip E. Benson, Costa Mesa, California, for plaintiff-appellant Barajas.

Frank D. Kortum, Office of the United States Attorney, Los Angeles, California, for plaintiff-appellee United States of America.

Before: PREGERSON, W. FLETCHER, and RONALD M. GOULD, Circuit Judges.

Opinion by Judge WILLIAM A. FLETCHER; Dissent by Judge GOULD

WILLIAM A. FLETCHER, Circuit Judge:

Under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, private individuals may bring qui tam civil actions against entities that have defrauded the government. If an FCA suit is brought by a private individual ("relator") as a qui tam action, the United States may choose to intervene. 31 U.S.C. § 3730(b)(2). Whether or not the government inter-

venes, the relator is entitled to a share of any recovery in the action. 31 U.S.C. §§ 3730(b)(4), (d). If the government declines to intervene but instead "pursue[s] its claim through any alternate remedy," the relator remains entitled to the same share of the recovery to which she would have been entitled had the government pursued its claim by intervening in the relator's qui tam action. 31 U.S.C. § 3730(c)(5). This appeal turns on the proper construction of the phrase "pursue[s] its claim through any alternate remedy." 31 U.S.C. § 3730(c)(5). We hold, in the circumstances of this case, that a suspension or debarment proceeding is an "alternate remedy" within the meaning of the FCA.

## I

In brief, the events leading to this appeal are as follows. Appellant Leocadio Barajas ("Barajas") brought a qui tam action under the FCA against his former employer, Northrop Corporation ("Northrop"), based on its falsified and incomplete testing of flight data transmitters ("FDTs"). The United States intervened in that action. When the government settled the action with Northrop, Barajas received his relator's share of the recovery.

After Barajas filed his qui tam action based on the falsified and incomplete testing, the United States filed a criminal action against Northrop. The indictment charged not only falsified and incomplete testing of the FDTs, but also delivery of FDTs containing "damping fluid" that did not comply with contractual specifications. Northrop pled guilty to some of the charges in the criminal action.

After Northrop's guilty plea, Barajas filed another qui tam action, pursuant to a First Amended and Severed Complaint ("Severed Complaint"), in the same district court as his already-pending qui tam action. The Severed Complaint was based on the damping fluid allegations, which were contained in the government's criminal complaint but not in Barajas' complaint in his first qui tam action. Although the government had intervened in Barajas' first qui tam action, it declined to do so in the second action.

After the government declined to intervene in Barajas' second action, the Air Force entered into an agreement ("Air Force Agreement" or "Agreement") with Northrop. The Agreement arose out of administrative proceedings in which the government had threatened to suspend or disbar Northrop from entering into contracts with the Department of Defense. *See* 48 C.F.R. § 9.407–1 *et seq.* Under the Agreement, Northrop agreed to provide FDTs containing damping fluid that met the contractual specifications, and to provide certain cash payments. The total value provided by Northrop to the government under the Agreement was probably in the millions of dollars.

Barajas contended in the district court, and contends here, that the Air Force Agreement is an "alternate remedy" to his second qui tam action, and that he is entitled to a relator's share of the proceeds of that remedy. The district court denied Barajas' motion for an order directing the government to give him a share of the proceeds from the Air Force Agreement, holding that the Agreement was not an "alternate remedy" under the FCA within the meaning of 31 U.S.C. § 3730(c)(5). For the reasons that follow, we disagree with the district court and reverse and remand for further proceedings.

## II

This is the fourth time that this court has reviewed various aspects of Barajas' FCA claims. *See United States ex rel. Barajas v. Northrop Corp.,* 5 F.3d 407 (9th Cir.1993) (*Barajas I* ); *United States ex*

*rel. Barajas v. Northrop Corp.*, 26 F.3d 135 (9th Cir.1994) (unpublished opinion); *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905 (9th Cir.1998) (*Barajas II* ). The following detailed narrative puts in proper context the legal issues in the appeal now before us.

Barajas' FCA actions arise from fraudulent and allegedly fraudulent acts committed by Northrop in the 1980s. The United States Air Force had contracted with Boeing Aerospace Corporation to manufacture nuclear Air Launched Cruise Missiles ("ALCMs"), and Boeing in turn had subcontracted with Northrop to manufacture flight data transmitters "FDTs" for the ALCMs. ALCMs are launched from planes at high altitudes, often in arctic regions. Because the ALCMs must function in extremely low temperatures, Northrop's contract required that the FDTs be able to withstand temperatures as low as sixty-five degrees below zero Fahrenheit. Northrop, however, used damping fluid (a fluid that restricts but does not prevent movement) that solidified at temperatures significantly warmer than contractually required, causing the FDTs to fail. Northrop was responsible not only for manufacturing but also for testing the FDTs. It concealed the FDTs' failure by falsifying the results of some tests and by failing to perform other tests.

Barajas was a test technician employed by Northrop in its Western Services Division plant in California. In early 1987, Barajas met with federal investigators and informed them of test falsifications in which he had been involved.[1] Later in 1987, Barajas and a colleague[2] filed a qui tam action against Northrop under the FCA. *See* 31 U.S.C. § 3729(a). Their complaint sought recovery, on behalf of the government, for the falsified and incom-

plete testing, but it did not seek recovery for the defective damping fluid. The United States intervened in the action under 31 U.S.C. § 3730(b)(2). The government's complaint in intervention, like that of Barajas and his colleague, sought recovery for the false testing but not for the defective damping fluid.

In 1989, the United States initiated criminal proceedings against Northrop, alleging that Northrop had (1) falsified some test results and failed to perform other tests, and (2) used damping fluid that solidified at temperatures above those required by the contract. The Air Force suspended the division of Northrop responsible for manufacturing the FDTs from contracting with the government, pending the outcome of the criminal case. *See* 48 C.F.R. § 9.407. In February 1990, Northrop pled guilty to making false statements regarding the testing of the FDTs, and paid $17 million in fines and penalties to the government. As a condition of this guilty plea, the government dismissed the counts of the indictment involving the defective damping fluid. *Barajas II*, 147 F.3d at 907, 908. Northrop's plea did not prohibit the Air Force from considering suspension or debarment of the company.

In March 1991, just over a year after Northrop pled guilty, Barajas commenced a second qui tam action under the FCA by filing a First Amended and Severed Complaint in the same district court where his original qui tam action was pending. His Severed Complaint sought recovery for Northrop's fraudulent use of the defective damping fluid based on the allegations that the government had included in its criminal indictment, but that neither he nor the government had included in their original complaints seeking recovery for the falsi-

---

1. Barajas was fired by Northrop in July, 1987. Northrop has settled Barajas' complaint arising out of his firing.

2. The colleague is not a party to this appeal.

fied and incomplete testing. The government never intervened in second qui tam action, and it never amended its complaint in the first action to include allegations that Northrop had used defective damping fluid.

Later in 1991, after Barajas filed his second qui tam action for defective damping fluid, the United States settled the first qui tam action for falsified and incomplete testing. Northrop agreed to pay the government $8 million, in return for which the government agreed (1) to dismiss the complaint and (2) to release Northrop from all FCA claims, "civil or administrative monetary actions or claims," and "actions or claims by the United States for restitution" related to the claims in that action. The settlement agreement specifically stated that it did not release Northrop from possible suspension or debarment proceedings. Barajas received a relator's share of the $8 million settlement that Northrop paid to the government. Barajas' share was reduced from the maximum allowed under the FCA because he had participated in the activities that led to the payment by his former employer. 31 U.S.C. §§ 3730(d)(1), (d)(3).

Still later that year, after the settlement of the first qui tam action, Northrop entered into the Air Force Agreement. Before the Agreement was signed, the U.S. Attorney for the Central District of California urged the Air Force to impose a harsher penalty on Northrop: "We are not aware of a more significant prosecution. . . . If any case cries out for debarment, this is the case." Despite the plea of the U.S. Attorney, the Air Force agreed to lift Northrop's temporary suspension and not to pursue its debarment. Although it made no admission of liability, Northrop agreed in return to repair and replace the defective FDTs, and to replace the defective damping fluid with fluid that met the requirements of the original contract. These services may have been worth as much as $10 million. *See* Rick Wartzman, *Northrop to Spend $10 Million to Fix Flaw in Cruise Missile, Air Force Says,* Wall St. J., May 3, 1991, at A14. Northrop also agreed to pay the government $250,000 "as complete reimbursement for costs the government will incur in connection with the FDT fluid replacement process," and "an additional $500,000 to compensate the government solely for the[ ] investigative and administrative costs" associated with the damping fluid claims. The government agreed that if Northrop fulfilled the terms of the Agreement, its contractual obligations to the government would be satisfied. The Agreement provided that it could not be used as evidence, except in a subsequent suspension or debarment proceeding, or "in any civil proceeding in which Northrop attempts to obtain appropriate credit for funds paid or value received pursuant to this Agreement[.]"

After entering into the Air Force Agreement, Northrop moved to dismiss Barajas' Severed Complaint in the second qui tam action on the ground that Barajas was not an "original source" of the damping fluid allegations as required by the FCA. 31 U.S.C. § 3730(e)(4)(A). The district court granted the motion, but we reversed and remanded. We held that Barajas was an original source of the allegations if he "(1) has some direct and independent knowledge of information on which the proposed amendments are based, and (2) voluntarily disclosed that information to the government before filing the original complaint." *Barajas I,* 5 F.3d at 411. On remand, the district court found that Barajas was an original source of the damping fluid allegations because his statements to federal investigators started them down the path on which they discovered that the fluid was defective. *United States ex rel. Bara-*

*jas v. Northrop,* 897 F.Supp. 1274, 1282 (C.D.Cal.1995).

Having failed in its argument that Barajas was not an "original source," Northrop moved in the district court to dismiss Barajas' second action on grounds of claim preclusion. It argued that the settlement of the first qui tam action, concerning the falsified and incomplete tests, foreclosed the second action, concerning the defective damping fluid. Northrop did not argue that the two complaints covered identical or nearly identical conduct, or that damage remedies in the two actions would constitute double recoveries. Rather, it argued that the two actions arose out of the same subject matter and should have been brought as a single action. The district court granted the motion to dismiss based on claim preclusion.

Northrop also moved to dismiss on the ground that the already-reached Air Force Agreement was an "alternate remedy" to the second qui tam action. Northrop argued that Barajas should not be able to pursue, in his second qui tam action, the damping fluid claims for which the government had already obtained a remedy. The government filed an amicus brief arguing (as it does here) that the Agreement was not an "alternate remedy" under the FCA and was therefore not an impediment to Barajas' second action. Although Barajas joined the government's brief, he now strenuously disagrees with that argument. Because the district court dismissed based on claim preclusion, it did not decide whether the Air Force Agreement was an alternate remedy.

We affirmed the district court's dismissal, holding that the damping fluid complaint was precluded by claim preclusion because it arose out of the "same transactional nucleus" as the test falsification complaint. *Barajas II,* 147 F.3d at 910. The "alternate remedy" issue was neither raised nor decided on appeal. Final judgment dismissing Barajas' second qui tam action was entered in February 1996.

On December 30, 1998, Barajas sought a relator's share of the proceeds of the Air Force Agreement. He filed a motion in the district court, in the now-dismissed second qui tam action, asking for an order directing the government to pay him a $750,000 share of the proceeds of the Air Force Agreement, or alternatively for an order allowing discovery on the value of the retrofit ordered by that Agreement. Barajas argued that the Air Force Agreement was an "alternate remedy" under the FCA, 31 U.S.C. § 3730(c)(5), and that, as the relator in the second qui tam action, he had the same rights to a relator's share of proceeds from the Agreement that he would have had if the government had pursued its defective damping fluid claims by intervening in that action.

In requesting the award of a $750,000 relator's share, Barajas stated that he "acknowledge[d] that his relator's award for the cold temperature claims cannot exceed the cash portion of the proceeds, i.e., $750,000." He asserted that the value obtained by the government in the Air Force Agreement was $10.75 million, and noted that a relator's share under the FCA is normally between twenty-five and thirty percent of the total recovery. 31 U.S.C. § 3730(d)(2). He then attempted to link his claim for $750,000 to the value of the award to the government: "Assuming that value of the cold fluid retrofit contract and cash recovery is only $3 million, Barajas is entitled to the $750,000 cash recovery (25% of $3 million)." Barajas further stated that his share should be greater than twenty-five percent "due to his 'unprecedented participation' in assisting the Government in pursuing the false testing and cold temperature claims against Northrop[.]"

The government opposed Barajas' motion on two procedural grounds. It argued, first, that Barajas had to file a motion to reopen the judgment before he could move for any substantive relief; and, second, that such motion was, in any event, barred by either the statute of limitations or by laches.

The district court found it unnecessary either to decide the amount to which Barajas might be entitled as a relator, or to rule on the procedural grounds asserted by the government. It simply denied relief on the merits, holding that the Air Force Agreement was not an alternate remedy, and that Barajas was therefore not entitled to a relator's share of the proceeds of the Agreement. *See United States ex rel. Barajas v. Northrop Corp.*, 65 F.Supp.2d 1097 (C.D.Cal.1999) (*Barajas III*). Barajas has timely appealed.

## III

Barajas bases his motion for a relator's share of the proceeds of the Air Force Agreement on 31 U.S.C. § 3730(c)(5), which states in pertinent part:

> [T]he Government may elect to pursue its claim *through any alternate remedy available to the Government*, including any administrative proceeding to determine a money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

(Emphasis added.) Barajas argues that the Agreement is an "alternate remedy" as the term is used in § 3730(c)(5). This provision was added to the FCA in 1986 and has received relatively little judicial attention since then. We are aware of no reported decision addressing the question whether a settlement conferring economic benefit on the government, arising out of a threatened suspension and debarment proceeding, can constitute an "alternate remedy" under § 3730(c)(5).

■ Statutory interpretation begins with the plain language of the statute. *See, e.g., United States v. Alvarez–Sanchez*, 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994) ("Statutory interpretation begins with the plain meaning of the statute's language."); *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir.1999) (citing *Seattle–First Nat'l Bank v. Conaway*, 98 F.3d 1195, 1197 (9th Cir.1996)) ("It is a well-recognized rule of statutory construction that '[t]he plain meaning of the statute controls, and courts will look no further, unless its application leads to unreasonable or impracticable results.' ").

An alternate remedy under § 3730(c)(5) is a remedy achieved through the government's pursuit of a claim after it has chosen not to intervene in a qui tam relator's FCA action. *See, e.g., United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 192 (4th Cir.1999); *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 739 (3d Cir.1997). The use of the term "alternate remedy" makes clear that the government must choose one remedy or the other; it cannot choose both. If the government chooses to intervene in a relator's action, and if the government recovers any proceeds in the action, the relator has a right to a share of those proceeds. If the government chooses not to intervene in the relator's action, but, instead, chooses to pursue "any alternate remedy," the relator has a right to recover a share of the proceeds of the "alternate remedy" to the same degree that he or she would have been entitled to a share of the proceeds of an FCA action.

■ The language of § 3730(c)(5) places no restrictions on the alternate remedies the government might pursue. It specifies broadly that the government may pursue

"*any* alternative remedy available to [it]" (emphasis added). The term "any" is generally used to indicate lack of restrictions or limitations on the term modified. *See Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1080 (9th Cir.1999) ("According to *Webster's Third New Int'l Dictionary* (3d ed.1986), 'any' means 'one, no matter what one'; 'ALL'; 'one or more discriminately from all those of a kind.' This broad meaning of 'any' has been recognized by this circuit." (citations omitted)); *Turner v. McMahon,* 830 F.2d 1003, 1007 (9th Cir.1987) ("[U]se of the adjective 'any' indicates that Congress intended that overpayments must be recouped without restriction.").

We recognize that, as pointed out by the district court and by Judge Gould in dissent, a suspension or debarment proceeding is significantly different from an FCA action. *See Barajas III,* 65 F.Supp.2d at 1102. Among other differences, the Department of Defense and the Air Force have no power to prosecute FCA claims, and, conversely, the Department of Justice has no power to initiate or control suspension or debarment proceedings. The government has no power in a suspension or debarment proceeding to compel production of evidence or the attendance of witnesses. *See Rutigliano Paper Stock Inc. v. United States Gen. Servs. Admin.,* 967 F.Supp. 757, 767 (E.D.N.Y.1997). Government contractors also enjoy relatively few procedural rights in such proceedings. *See* 48 C.F.R. §§ 9.0406—9.0407. Moreover, the parties have a different kind of stake in a suspension or debarment proceeding than in an FCA action. A defense contractor is not alone in wishing to avoid suspension or debarment. Debarment could eliminate a contractor's largest (and often only) customer, but suspension or debarment can also put the government in the distressing position of eliminating its primary (and sometimes only) supplier. *See, e.g., Talley Industries, Inc. v.*

*Comm'r,* 116 F.3d 382, 384 (9th Cir.1997) (noting that "there was some urgency to reaching a settlement" regarding civil claims against the defendant, which faced possible debarment, because it "was one of three companies that could manufacture . . . ejection seats and Navy fighter planes had been grounded because the Navy could not obtain new seats or repair existing seats"). Because of the losses that suspension or debarment might cause the government to suffer, the government might have an incentive to settle for less in such a proceeding than in an FCA action in which the same or similar remedy is sought.

Despite the differences between an FCA action and a suspension or debarment proceeding, the government can, and sometimes does, seek a remedy in such a proceeding that effectively takes the place of the FCA remedy. This is what took place in this case. Through the Air Force Agreement, the government obtained a remedy from Northrop for the defective damping fluid that substantially replicated the remedy it could have obtained if it had intervened in Barajas' second qui tam action. Indeed, the Agreement itself appears to have explicitly taken into account the overlap with the remedy Barajas sought in his second action. While the Agreement strictly limited the evidentiary use to which it could be put, it specifically provided that it could be used by Northrop "in any civil proceeding in which Northrop attempts to obtain appropriate credit for funds paid or value received pursuant to this Agreement." The obvious "civil proceeding" in which Northrop would have been able to receive "appropriate credit for funds paid or value received" was, of course, Barajas' second qui tam action, in which he sought a remedy for precisely the same problem—the defective damping fluid—for which the Agreement provided a remedy.

"[W]hile the plain language of a statute is not always conclusive, we ignore plain language only when a 'literal interpretation would thwart the purpose of the overall statutory scheme or lead to an absurd result.'" *In re Cervantes,* 219 F.3d 955 (9th Cir.2000), citing *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.,* 881 F.2d 801, 804 (9th Cir.1989). In this case, the purpose of the statutory scheme is clear. The FCA is designed to help fight fraud against the government by encouraging private individuals to come forward with information about fraud that might otherwise remain hidden. The encouragement is provided by giving these individuals a relator's share of any recovery obtained using the relator's information in an FCA action, or an equivalent share of a recovery obtained using that same information to procure an "alternative remedy."

It is entirely consistent with this purpose to read the "any alternative remedy" language of § 3730(c)(5) to mean what it says. It can be quite difficult for private individuals—particularly for "whistleblowers" like Barajas—to come forward with damaging information about their employers. In some instances, the whistleblowers have participated in the wrongdoing (as Barajas did), and in some instances, the whistleblowers are fired because of their whistleblowing (as Barajas may have been). It would be inconsistent not only with the plain meaning of the broad language employed in the statute, but also with the purpose of the statute, to allow the government to obtain from a qui tam defendant a remedy that could have been obtained in an already-filed FCA action, and then to argue that the proceeds of that remedy need not be shared with the whistleblower because the remedy was not an "alternate remedy" within the meaning of the FCA.

We do not hold that a suspension or debarment proceeding is always an "alter-

nate remedy" within the meaning of the FCA. Indeed, we believe that it rarely will be. We do hold, however, that in some circumstances, a suspension or debarment proceeding *can* be an alternate remedy.

In this case, Barajas filed a second qui tam FCA action against Northrop, seeking recovery for defective damping fluid. The government declined to intervene in this action, choosing instead to go forward with a suspension or debarment proceeding based on the conduct that formed the basis of the action. The government then settled Barajas' first qui tam action for false testing, with the result that Barajas was later found barred by claim preclusion from pursuing his second qui tam action for defective damping fluid. Meanwhile the government pursued its suspension or debarment proceeding against Northrop, ultimately obtaining the Air Force Agreement. The government would have been barred by claim preclusion from pursuing the second qui tam action, just as Barajas was. But because claim preclusion was not a defense to a suspension or debarment proceeding, the government was able to escape the consequence of its settlement of the first action by pursuing that alternative.

In sum, we have the following sequence of events: the government first refused to intervene in Barajas' second action; then the government settled the first action, making it impossible for Barajas to proceed with that second action; finally, the government brought a suspension or debarment proceeding that allowed it to achieve essentially the same result it could have achieved by intervening in Barajas' second action. The notable consequence of this sequence is that the government now hopes to avoid paying Barajas the relator's share to which he would have been entitled if his second action had been permitted to go forward to a successful

conclusion. Under these circumstances, we hold that the remedy achieved by the government in the Air Force Agreement is an alternate remedy within the meaning of the FCA.

## IV

The FCA provides that a relator is entitled to a specific percentage of "the proceeds of the action or settlement of the claim." 31 U.S.C. § 3730(c)(1). The parties do not dispute that the $750,000 in cash transferred from Northrop to the government should be characterized as "proceeds." But the government argues that if the Air Force Agreement is deemed an alternate remedy, the value of the replacement and repair of the FDTs and replacement of the damping fluid should not be included as part of its "proceeds" of the settlement of its claim.

Whether the definition of "proceeds," as used in the FCA, includes in-kind services is a question of first impression for this court. We have looked to the dictionary definition of the word "proceeds" when interpreting its use in other statutes, *see, e.g., United States v. Akintobi,* 159 F.3d 401, 403 (9th Cir.1998), and we do so here. *Webster's Third New International Dictionary* defines "proceeds" as "what is produced or derived from something ... by way of total revenue: the total amount brought in"; "the net profit made on something." We have held that the term "proceeds," as used in another statute that, like the FCA, does not define the term, need not "always consist of money or some tangible asset." *United States v. Estacio,* 64 F.3d 477, 480 (9th Cir.1995); *see also Phelps v. Harris,* 101 U.S. 370, 380, 25 L.Ed. 855 (1879) ("Proceeds are not necessarily money. This is ... a word of great generality."). The Fifth Circuit recently came to the same conclusion in an FCA case, holding that the value of claims released pursuant to a settlement agreement should be deemed part of the proceeds of the agreement. *United States v. Thornton,* 207 F.3d 769, 770 (5th Cir.2000).

■ On the facts of this case, it is clear that if Northrop had not agreed to replace and repair the faulty FDTs and replace the defective damping fluid, the government would have had to pay to cure the problem. The value of the "proceeds" of the Air Force Agreement is therefore the amount the government would have had to pay to Northrop, or to some other contractor if that amount would be less, to cure the problem that Northrop agreed to cure in the Agreement. Assuming he is otherwise entitled to relief, Barajas is entitled to a relator's share of those proceeds. We note, however, that Barajas asked in the district court for an award of no more than $750,000, on the incorrect theory that his recovery was limited to the amount of the cash transfer from Northrop to the government. If the district court on remand decides that Barajas' action is not barred on procedural grounds, it may decide, in its discretion, whether to permit Barajas to claim a relator's share of the total proceeds of the Air Force Agreement, or to limit Barajas to the $750,000 he previously sought.

## V

As noted above, the government argued in the district court that Barajas should have been denied relief on procedural grounds, but the district court did not reach those grounds because it denied relief on the merits. It is possible that the district court on remand will deny relief based on one or more of those grounds. We do not intimate any view concerning their proper resolution.

## CONCLUSION

Under the circumstances of this case, construing the Air Force Agreement as an "alternate remedy" under the FCA is consistent with both the plain language and

the purpose of the statute. We reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

RONALD M. GOULD, Circuit Judge, dissenting:

I respectfully dissent. Barajas is not entitled to any proceeds from the Air Force Agreement because debarment is not an "administrative proceeding to determine a money penalty" nor otherwise an "alternate remedy" for an FCA claim. *See* 31 U.S.C. § 3730(c)(5) ("[T]he Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a money penalty.").

The party-plaintiff in an FCA action is the United States. FCA claims asserting fraud against the United States may be brought by the Attorney General through the Department of Justice directly, or by a relator indirectly for the United States. In contrast, a debarment proceeding is brought by the contracting agency pursuant to regulations relating to federal government contracting. 48 C.F.R. § 9.406–3. A debarment proceeding may indeed be based on any cause that affects the present responsibility of a government contractor or subcontractor, and need not be based on commission of fraud. 48 C.F.R. § 9.406–2(c).

Here, the initial FCA claims were asserted for the United States by the Attorney General; the debarment proceedings were initiated by the United States Air Force, which purchased the flight data transmitters for cruise missiles. Even if the Air Force may be considered part of the "Government," it nonetheless is incorrect and ill-advised to conclude that the

Air Force in a debarment proceeding is "pursuing its [the Government's] claim through [an] alternate remedy available to the Government. . . ." Stated another way, the Air Force in a debarment proceeding helps to preserve national security by ensuring a responsible contractor; it does not pursue a "money penalty" or "alternate remedy" to compensate the government for a fraud claim that could have been pursued in FCA litigation.

The purpose of a debarment proceeding is to exclude a government contractor from participating (for a designated period of time) in any procurement or nonprocurement activity with a federal agency where that contractor has acted improperly. 15A Fed. Pro., L.Ed. § 39.1334, at 785 (West 1998). Although a contractor's agreement to make full restitution and to pay all criminal, civil, and administrative liability for the improper activity, including any investigative or administrative costs, is considered a mitigating factor, 48 C.F.R. § 9.406.1(a)(5), the recovery of such costs is not the essential purpose of a debarment proceeding. I would hold that the debarment process is not an "alternate remedy" to FCA proceedings even where, as here, the debarment process pertains to the same subject matter as an existing or potential FCA claim.

The majority opinion creates an unworkable and unmanageable precedent. Although Barajas, before us, has limited his claim to the monies recovered by the government, nothing in the majority opinion would preclude a qui tam plaintiff from seeking to recover part of the value of the entire debarment settlement between the government and its contractor. Settlements made to resolve debarment proceedings may be difficult, if not impossible, to value.[1]

---

1. For example, what is the value of new or revised review and control procedures and ethics training programs?

In addition to these valuation difficulties, the precedential effect of the majority's opinion adds a complexity that may interfere with debarment resolutions and could impede relationships between the Department of Defense and its contractors. This may have an unintended negative impact on national defense contracting and the underlying national security and safety concerns. Congress could establish that FCA alternate remedies include settlements gained through debarment proceedings, but has not done so. We should not by interpretation expand the FCA in a way that may interfere with national defense contracting.

Finally, I recognize that the majority may be motivated by a concern that the result is unfair to Barajas, where the United States through the Air Force received restitution on a claim that Barajas tried unsuccessfully to pursue under the FCA. But, even if we were to consider fairness as a tool to interpret the FCA, I see nothing unfair here. Barajas's failure to collect a share on the damping fluid claims is the result of his own choice to accept settlement of the false testing qui tam action. Had he objected to the prior settlement as insufficient, in view of damping fluid claims, a court might have addressed his concerns before the settlement was final. After the settlement became final, he belatedly recognized that res judicata barred his further FCA claims relating to damping fluid. His attempt to avoid the res judicata effects of the earlier agreement through a strained construction of "alternate remedy" should not be credited by this court.

Finally, the majority opinion challenges the following "sequence of events" (*my comments follow in Italics*): (1) the Department of Justice settled an initial qui tam action (*but Barajas interposed no objection*); (2) it was therefore "impossible for Barajas to proceed with [the] second action" (*but this was a legal consequence determined by us, not some other part of the government, in an earlier appeal*); (3) the Air Force "brought a suspension or debarment proceeding that allowed it to achieve essentially the same result it could have achieved by intervening in Barajas' second action" (*but in fact, the Air Force suspension or debarment proceeding gave it many options to ensure a viable supplier, and an incidental money remedy was only part of relief gained*); and (4) the "consequence of this sequence is that the government now hopes to avoid paying Barajas the relator's share to which he would have been entitled" had his second qui tam action proceeded (*but, whatever the government "hopes to avoid paying," it certainly has the right and indeed the duty to defend against contested claims that ultimately are paid by taxpayer dollars*). There is no support in the record showing a coordination between the Department of Justice and the Air Force to frustrate a qui tam claim by Barajas, nor does the majority really suggest any bad faith. Merely describing independent agencies of the United States as "the government" does not prove a design to deprive Barajas of something to which he claims to be entitled.[2]

---

**2.** And, as I have earlier explained, Barajas' preclusion from a second qui tam action with its consequences is something which he could have addressed by objecting to the first qui tam settlement.