# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-20182

United States Court of Appeals
Fifth Circuit

**FILED**

February 14, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA, ex rel;
SAMUEL BABALOLA; KAYODE SAMUEL ADETUNMBI,

Plaintiffs - Appellants

UNITED STATES OF AMERICA,

Appellee

v.

ARUN SHARMA, doing business as Allergy Asthma Arthritis & Pain Center;
KIRAN SHARMA, doing business as Allergy Asthma Arthritis & Pain
Center,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before KING, BENAVIDES, and DENNIS, Circuit Judges.
FORTUNATO P. BENAVIDES, Circuit Judge:

This appeal is from the grant of partial summary judgment in favor of
the United States in a qui tam action under the False Claims Act. The two
relators filed the instant suit against their former employers, alleging that the
defendants had defrauded the Government by filing tens of millions of dollars
in fraudulent Medicare and Medicaid claims. Prior to the filing of this qui tam
suit, the Government had criminally prosecuted the instant defendants for

No. 13-20182

fraud and obtained a multi-million dollar award of restitution. The sole issue on appeal is a question of first impression in the Fifth Circuit. The question is whether the district court properly held that, because there was no qui tam complaint in existence at the time the Government pursued criminal charges against the defendants, the criminal proceeding did not constitute an "alternate remedy" under 31 U.S.C. § 3730(c)(5), and thus, the relators had no right to share in that recovery. We agree with the district court and hold that because there was no qui tam action pending at the commencement of the restitution proceeding, the restitution proceeding does not constitute an alternate remedy under the statute. We therefore affirm the partial summary judgment and remand for further proceedings.

## I.    BACKGROUND

The two relators, Samuel Babalola and Kayode Samuel Adetunmbi, had practiced medicine in Nigeria before immigrating to the United States. The relators worked as medical assistants for the defendants, Dr. Arun Sharma and Dr. Kiran Sharma, at the defendants' two medical clinics located in Baytown and Webster, Texas. During their employment, the relators witnessed the Sharmas filing fraudulent claims with Medicare, Medicaid, and private insurance companies. In 2007, based on their observations, the relators drafted an anonymous letter setting forth details of the fraudulent claims the Sharmas submitted to Medicare, Medicaid, and various private insurance companies. The relators sent this letter to various government agencies.

Subsequently, the Government conducted a criminal investigation with respect to the allegations in the letter. On July 16, 2009, a federal grand jury indicted the Sharmas, charging them with 64 counts of conspiracy, healthcare fraud, and other federal crimes. Thereafter, in the course of the investigation, the Government contacted the relators and asked them whether they had

2

No. 13-20182

worked for the Sharmas and had any information with respect to the allegations of fraud in indictment. The relators met with the representatives from the FBI, DEA, and the United States Attorney's Office regarding the allegations. The relators agreed to testify at trial against the Sharmas. However, on April 26, 2010, the Sharmas both pleaded guilty to conspiracy to commit healthcare and mail fraud and one substantive count of health care fraud in violation of 18 U.S.C. §§ 371 and 1347. In February 2011, at their sentencing, the district court ordered the Sharmas to pay over $43 million in restitution to Medicare, Medicaid, and certain private insurers. The Sharmas appealed, and this Court vacated the restitution order and remanded the case to the district court for a recalculation of restitution because the "amount exceeded the insurers' actual losses by millions of dollars." *United States v. Sharma*, 703 F.3d 318, 327 (5th Cir. 2012), *cert. denied*, No. 12-1312, 2013 WL 5507456 (October 7, 2013).

Meanwhile, on November 17, 2011, while the Sharmas' direct criminal appeal was pending, the relators filed the instant suit against the Sharmas under both the False Claims Act ("FCA"), 31 U.S.C. 3729 *et seq.*, and the Texas False Claims Act based on the same fraudulent claims that the relators had set forth in the anonymous letter (and also the basis of the Sharmas' criminal convictions). Both the Government and Texas[1] declined to intervene in the qui tam action. *See* 31 U.S.C. § 3730(b)(2). Pursuant to statute, the complaint remained under seal until the district court ordered that it be served on the defendants. *Id.*

On May 1, 2012, the relators filed a motion to compel depositions of certain Department of Justice employees. In this motion, the relators asserted that "discovery on the issue of relator's share is proper at this time because the only

---

[1] The State of Texas is not a party to this appeal.

dispute before the Court is whether relators are entitled to a share of the criminal forfeiture previously obtained by the United States from Defendants as an alternate remedy under 31 U.S.C. § 3730(c)(5)."

The Government filed a motion for partial summary judgment, arguing that, as a matter of law, the relators were not entitled to a share of the restitution that was awarded in the Sharma's criminal case prior to the filing of the instant FCA action. The district court granted the motion, holding that because there was no valid FCA complaint in existence at the time the restitution was awarded to the Government, the criminal proceeding did not constitute an "alternate remedy" under 31 U.S.C. § 3730(c)(5), and thus, the relators had no right to share in that recovery. The relators then filed a motion to certify a permissive interlocutory appeal, and the district court granted it. 28 U.S.C. § 1292(b). This Court subsequently granted the relators leave to appeal from the interlocutory order on April 5, 2013.

On June 6, 2013, in the criminal proceedings, the district court re-sentenced the Sharmas, and ordered restitution in the amount of $37,636,436.39. The Sharmas appealed the amended judgment, including the order of forfeiture and restitution, and that appeal is currently pending before this Court. *United States v. Sharma, et al.*, 13-20325.

## II.    ANALYSIS

### A.    Standard of Review

The relators contend that the district court erred in granting the Government's motion for partial summary judgment. This Court reviews a district court's ruling on summary judgment de novo, applying the same standard as the district court. *See, e.g., Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996). Summary judgment is proper if the record

4

reflects "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### B.    FCA Alternate Remedy

The FCA makes liable any person who presents the Government with false or fraudulent claims for payment or approval. 31 U.S.C. § 3729. Section 3730(a) provides that the "Attorney General may bring a civil action under this section against the person" who violates § 3729. Section 3730(b), the qui tam provision, provides that a "person may bring a civil action for a violation of section 3729 for the person and for the United States Government." § 3730(b).[2] "Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty." § 3730(c)(5). Further, "[i]f any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." *Id*.

The issue briefed on this interlocutory appeal is a narrow one, and it is one of first impression in this circuit. The district court held that because the relators filed their qui tam action *after* the Government had begun to criminally prosecute the defendants, the criminal proceeding was not an "alternate remedy" in which the relators could exercise their rights to recovery. § 3730(c)(5).[3] In other words, the district court held that the "filing of a valid

---

[2] "Qui tam is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur,*' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Intern. Corp. v. United States,* 549 U.S. 457, 463 n.2 (2007).

[3] The district court expressly stated that it "need not decide the precise moment at which the United States 'elected' to pursue the criminal action. Since the indictment was obtained on July 16, 2009, the court is satisfied that the United States 'elected' to pursue the

qui tam action is a prerequisite to the operation of the 'alternate remedy' provision." Op. at 10. Here, when the Government pursued the criminal charges, there was no qui tam action pending, and thus, the court reasoned that the criminal proceedings could not be deemed an "alternate remedy" under § 3730(c)(5) because a "criminal action cannot be an alternative to an action that does not exist." *Id.*

We must determine whether the district court properly construed the FCA to require a pending qui tam action in order for another proceeding to constitute an alternate remedy.[4] "When courts interpret statutes, the initial inquiry is the language of the statute itself." *Hightower v. Texas Hosp. Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995). This Court looks at the "language of the statute as well as the design, object and policy in determining the plain meaning of a statute." *Id.* Additionally, the "statute must be read as a whole in order to ascertain the meaning of the language in context of the desired goals envisioned by Congress." *Id.* We only look to the legislative history if the language is unclear. *Id.*

We now turn to the language of the statute. As previously set forth, § 3730(c)(5) provides in part that: "Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to

---

criminal action well before the qui tam complaint was filed" on November 17, 2011. Op. at 10 n.25.

[4] To be clear, we are *not* deciding the issue of whether a criminal proceeding may constitute an "alternate remedy" under § 3730(c)(5). *Compare United States v. Bisig,* No. 02-112, 2005 WL 3532554 (S.D. Ind. Dec. 21, 2005) (holding that a criminal proceeding could constitute an alternate remedy under the FCA), *with United States v. Lustman,* No. 05-40082, 2006 WL 1207145 (S.D. Ill. May 4, 2006) (holding that the relators could not intervene in a concurrent criminal case because it ruled that a criminal proceeding was not an "alternate remedy" under the FCA). We are assuming *arguendo* for purposes of this appeal that such a proceeding would constitute an alternate remedy under the statute. We note that the district court did not reach that issue, and the parties on appeal have not briefed that issue.

determine a civil money penalty." The statute's reference to subsection (b) is to the provision in § 3730 that allows a private person to file a qui tam action. Thus, this first sentence means that, notwithstanding that a private person has filed a qui tam suit, the Government may elect to pursue an alternate remedy to the qui tam suit. Section 3730(c)(5) further provides that: "If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." Clearly, this language protects the rights of the relators once the Government elects to pursue an alternate remedy and "assumes that the original qui tam action did not continue." *United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 192 (4th Cir. 1999).

The word "alternate," as used in this context, is defined as "a choice between two or among more than two objects or courses." Webster's Third New International Dictionary (1993) at p. 63. We agree with the district court's reasoning that for a remedy to be "alternate" to the qui tam proceeding, there must have been two proceedings from which to choose. Accordingly, we hold that the qui tam proceeding must have been in existence at the time of the Government's election of the alternate remedy.

Although no circuit court has expressly held that a qui tam action must be filed prior to the alternate remedy, we interpret other circuits' analyses of the alternate remedy provision as implicitly recognizing that a qui tam suit must be filed before there is an alternate remedy. For instance, the Sixth Circuit has addressed the question of whether the district court had properly held that because the Government had not intervened in the qui tam action, the relator was not entitled to a share of the proceeds from the Government's separate settlement with the defendant. *United States ex rel. Bledsoe v. Comm. Health Sys.*, 342 F.3d 634, 647 (6th Cir. 2003). The relator contended that the

separate settlement constituted an alternate remedy under the FCA. *Id.* The Sixth Circuit opined that the "answer turns on the proper definition of 'alternate remedy,' either as an alternative to judicial enforcement of the FCA once the government has intervened in a qui tam suit, or an alternative to intervening in the qui tam suit entirely." *Id.* The way the Sixth Circuit framed the issue arguably presumes that a qui tam action is pending. Even if the framed issue does not necessarily presume a pending qui tam action, the Court's ultimate holding implicitly does. The Sixth Circuit held that a "settlement pursued by the government *in lieu of* intervening in a qui tam action asserting the same FCA claims constitutes an 'alternate remedy' for purposes of 31 U.S.C. § 3730(c)(5)." *Id.* at 649 (emphasis added). *See also United States ex rel. LaCorte v. Wagner*, 185 F.3d 188, 190 (4th Cir. 1999)[5] (opining that the alternate remedy provision "simply preserves the rights of the *original* qui tam plaintiffs when the government resorts to an *alternate remedy in place of the original action*") (emphasis added); *United States ex rel. Barajas v. Northrop Corp.*, 258 F.3d 1004, 1010 (9th Cir. 2001)[6] (describing an "alternate remedy under §3730(c)(5) [as] a remedy achieved through the government's pursuit of a claim *after* it has chosen not to intervene in a qui tam relator's FCA action") (emphasis added).[7]

---

[5] In *LaCorte*, the relevant issue on appeal was whether the alternate remedy provision created an exception to the statutory bar against allowing private parties intervening in a qui tam action. 185 F.3d at 191—92.

[6] In *Barajas*, the principal issue on appeal was whether an administrative proceeding with respect to suspending or debarring a government contractor could constitute an alternate remedy under the FCA. 258 F.3d at 1005.

[7] The relators assert that they satisfied the only statutory requirement governing when a qui tam complaint must be filed. We agree; however, this assertion misses the point. The issue is not whether the qui tam suit was timely filed. Instead, the issue is whether the restitution proceedings constitute an alternate remedy. It is undisputed that the relators filed this qui tam action inside the applicable six-year statute of limitations. *See* § 3731(b)(1). The relators have filed a valid qui tam action. The disposition of this interlocutory appeal from the partial summary judgment does not invalidate the qui tam action; this appeal only

No. 13-20182

Nevertheless, the relators argue that our holding "would completely eviscerate the FCA by allowing the government to sidestep putative relators by racing to beat them to the courthouse through initiating related criminal or other actions as soon as a putative relator voluntarily discloses fraud to the government before filing suit, as required by Section 3730(e))(4)(B)." We are not persuaded that our holding would allow such a scenario. The relators are correct that § 3730(e)(4)(B) provides that "'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action." However, we have explained that this disclosure requirement is satisfied when, as directed by § 3730(b)(2), a relator serves the Government with a "copy of the [qui tam] complaint and written disclosure of substantially all material evidence and information the person possesses." *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 175 (5th Cir. 2004). Further, the FCA requires that the complaint be filed in camera and remain under seal for 60 days before being served on the defendant or until the court orders service. § 3730(b)(2). This procedure allows the Government 60 days after it receives the information to determine whether to intervene in the qui tam proceeding. *Id.* Accordingly, the FCA's procedures require the relator to disclose his information to the Government at the time the qui tam complaint is filed in camera. At that point, there would be an existing qui tam action and therefore, if the Government

---

determines whether the restitution proceedings constitute an alternate remedy. Here, it is undisputed by the district court and the Government that the qui tam suit may proceed at the conclusion of this interlocutory appeal. The relators alternatively argue that if there is an additional time limitation, the relators have satisfied it because they filed the qui tam action prior to the alternate remedy becoming final. Because we hold that the qui tam action must be filed *prior* to the commencement of the alternate remedy proceeding, we need not reach this argument.

9

elects to pursue the case in another proceeding, it would be an alternate remedy. No rush to the courthouse would ensue.[8] Indeed, the FCA's procedures set forth above protect the relator's rights to the qui tam action and the Government's right to decide whether to intervene in the action. We hold that the FCA requires that a qui tam proceeding must have been in existence at the time of the Government's election of the alternate remedy.

## III.    CONCLUSION

For the above reasons, the district court's partial summary judgment is AFFIRMED, and the case is REMANDED for further proceedings.

---

[8] In any event, the scenario of the Government rushing to file suit ahead of the qui tam relators is certainly *not* what happened in the instant case. Here, the criminal defendants were indicted in 2009, pleaded guilty in 2010, and the initial restitution was awarded in February of 2011. The relators did not file the instant qui tam complaint until November of 2011. *Cf. Webster v. United States,* 217 F.3d 843 (table), 2000 WL 962249, at *2 (4th Cir. 2000) (unpublished) ("Requiring a qui tam plaintiff to make some effort to prosecute her suit in order to participate in any ultimate recovery results in neither unfairness nor the frustration of congressional policy.").

No. 13-20182

JAMES L. DENNIS, Circuit Judge, concurring:

I concur in the court's interpretation of the False Claims Act because that interpretation appears to be required by the text of the statute. However, I write separately to say, this interpretation, although apparently the correct one, leads to results that arguably are inequitable and at odds with the purpose of the statute. Thus, consideration by Congress is warranted as to whether this result is what it intended.

The False Claims Act creates a cause of action for the United States to recover economic losses incurred from fraudulent claims for payment. 31 U.S.C. § 3729. The Attorney General pursues such actions on behalf of the government. *Id.* § 3730(a). Alternatively, under the statute's "*qui tam*" provisions, private whistleblowers—"relators"—who have evidence of fraud against the United States may assert the government's claim on its behalf. *Id.* § 3730(b). As reward for doing so, the relators share in the government's winnings, receiving a bounty of up to thirty percent of the government's proceeds "depending upon the extent to which the person substantially contributed to the prosecution of the action." *Id.* § 3730(d).[1] At issue in this

---

[1] If the government does not intervene in the *qui tam* suit and the relators pursue the action alone, the award for the relators is between twenty-five and thirty percent of the proceeds, determined by the court based on what is "reasonable." 31 U.S.C. § 3730(d)(2). If the government does intervene, the award to the relators is between fifteen and twenty-five percent of the proceeds "depending upon the extent to which the [the relators] substantially contributed to the prosecution of the action. *Id.* § 3730(d)(1). However, when the *qui tam* suit is "based primarily on the disclosures of specific information (other than information provided by the [relators]) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media," the award is no more than ten percent of the proceeds, determined by the court based on what is "appropriate," "taking into account the significance of the information and the role of the [relators] in advancing the case to litigation." *Id.*

11

case is the Act's "alternate remedy" provision, § 3730(c)(5), which provides in the relevant part:

> Notwithstanding subsection (b) [the *qui tam* provision], the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

*Id.* § 3730(c)(5).

The first clause of § 3730(c)(5) provides simply that, notwithstanding the authority granted to relators to pursue *qui tam* suits under § 3730(b), the government retains authority ("the Government may elect") "to pursue its claim [to recover for fraud] through any alternate remedy available to the Government." In other words, under the first clause, the authority granted in § 3730(b) (the authority of relators to pursue *qui tam* suits) should not be read as implicitly restricting other similar authority (the authority of the government to pursue available alternate remedies). *Cf., e.g., Christensen v. Harris Cnty.*, 529 U.S. 576, 583 (2000) (discussing the canon of statutory interpretation providing that, "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode" (quoting *Raleigh & Gaston R.R. Co. v. Reid*, 80 U.S. 269, 270 (1871))).

The second clause of § 3730(c)(5) provides that, if the government does pursue an "alternate remedy" "in another proceeding," then "the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section." "The person initiating the action" refers to the relator ("the person") who initiates

12

the *qui tam* suit under § 3730(b) ("the action"). "This section" refers, of course, to § 3730, which, *inter alia*, obligates the Attorney General to pursue False Claims Act suits for the government (§ 3730(a)), authorizes relators to pursue *qui tam* suits (§ 3730(b)), apportions authority between the government and relators (§ 3730(c)), and affords relators a bounty for their role in uncovering fraud against the government (§ 3730(d)). Accordingly, the second clause of § 3730(c)(5) provides that, if relators file a *qui tam* suit under § 3730(b), and the government, instead of participating in that suit, pursues an "alternate remedy" for recompense for the fraud, the relators retain "the same rights" they would have enjoyed if the government had intervened in their *qui tam* suit—most importantly, their right to a bounty, a fair share of the government's proceeds. *See also* Gov't's Br. 19 ("The purpose of [§ 3730(c)(5)] is to ensure that a relator who has filed a valid *qui tam* complaint is not deprived of the bounty prescribed by the statute if the government subsequently decides to seek an alternate remedy for the same fraudulent acts.").

The issue in this case is whether § 3730(c)(5) affords relators the right to recover a fair share of money recovered by the government in "alternate remedy" proceedings that were instituted *before* the relators filed their *qui tam* suit? The court today holds that it does not: that, when the government pursues an "alternate remedy," § 3730(c)(5) affords relators only the "same rights" as they would have had in an *existing qui tam* suit, not as they would have had in a hypothetical *qui tam* suit the relators *could have* filed (but did not) *before* the government pursued the "alternate remedy." In other words, the court holds that, under § 3730(c)(5), if whistleblowers, like relator-appellants Samuel Babalola and Kayode Samuel Adetunmbi here, provide the government with their evidence of fraud but do not file a *qui tam* suit, and the

government uses that information to pursue recompense for the fraud, the whistleblowers receive *nothing* from the government's proceeds, even if they later retain an attorney and file a *qui tam* suit.

Section 3730(c)(5)'s text appears to mandate this result: it grants relators the "same rights" as they "would have had if [their *qui tam* suit] had *continued* under this section." (Emphasis added.) A *qui tam* suit cannot "continue" until it has begun. If a *qui tam* suit does not begin, it cannot "continue," and, thus, § 3730(c)(5) does not afford any rights.

Furthermore, this interpretation is consistent with § 3730(e)(3), which provides: "In no event may a person bring [a *qui tam* suit] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." Under § 3730(e)(3), if whistleblowers provide the government with evidence of fraud but do not first file a *qui tam* suit, and the government then uses the whistleblowers' information to file the government's own False Claims Act suit (or other "civil suit" or "administrative civil money penalty proceeding") before the whistleblowers file a *qui tam* suit, beating the whistleblowers in the "race to the courthouse," the whistleblowers receive nothing under the False Claims Act. *See Costner v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir. 1998) ("If the government files an action to enforce the [False Claims Act], a would-be relator may not later bring any action based on the same underlying facts." (quoting *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 746 (9th Cir. 1993))). The statute gives them no rights ("In no event" may they maintain a *qui tam* action as relators). Accordingly, if whistleblowers lose their right to a bounty when the government beats them in the race to the courthouse by filing the first False Claims Act suit, it follows that a similar result ensues when the government pursues an "alternate

14

remedy" rather than a False Claims Act suit. After all, § 3730(c)(5) is intended to provide relators the "*same* rights" (emphasis added) as they would have had in the absence of the government's pursuit of an "alternate remedy," not to afford relators *additional* rights.

Thus, under § 3730(c)(5), as interpreted today, and § 3730(e)(3), if the government begins proceedings to recover recompense for fraud *before* the relators file a *qui tam* suit, then the False Claims Act gives the relators *no award* from the proceeds of the government's action—*even if* the relators made the government's prosecution possible by uncovering the fraud to the government and further provided substantial assistance in the government's prosecution.

Here, Babalola and Adetunmbi provided the government with evidence that their employers, two Texas doctors, had a long-running scheme of defrauding Medicaid and Medicare and had cost the government and private insurers tens of millions of dollars. Babalola and Adetunmbi could have withheld their information and allowed the fraud to continue while they searched for an attorney to represent their interests in a *qui tam* suit. But they did not—they took the path of the Good Samaritan and without delay provided the government with the evidence needed to pursue the defrauders. Using Babalola and Adetunmbi's information, the government prosecuted the doctors for criminal fraud and obtained restitution and forfeiture orders from the court requiring the doctors to make recompense for the millions of dollars in losses. In addition to revealing the fraud to the government, Babalola and Adetunmbi further assisted the government's pursuit of recompense by agreeing to serve as witnesses at trial and testify in support of the government's case. For all their efforts, Babalola and Adetunmbi received *nothing*. Had Babalola and Adetunmbi *first* filed their *qui tam* suit *before*

providing their information to the government, then they would have been entitled, under § 3730(d)(1), to an award of between fifteen to thirty percent of the government's proceeds.[2]  Did Congress really intend that, merely because Babalola and Adetunmbi lost to the government in the race to the courthouse, their substantial assistance is no longer worth fifteen to thirty percent, but *zero*?

We have said before that "[t]he purpose of the False Claims Act, of course, is to discourage fraud against the government, and the whistleblower provision is intended to encourage those with knowledge of fraud to come forward." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994).  But under § 3730(c)(5) and (e)(3), it would be foolish for whistleblowers with knowledge of fraud to "come forward" with their information forthwith instead of withholding it from the government (and allowing the fraud to continue) until they first take however much time is needed, months or even years, to "lawyer up" and file a *qui tam* suit.  If whistleblowers selflessly report fraud to the government at the earliest possible time instead of delaying their action until they "lawyer up" and file their own suit, then, under § 3730(c)(5) and (e)(3), the government can—and, this case shows, *will*—deny to the whistleblowers the bounty that the False Claims Act otherwise promises and provides.  Did Congress really intend for the statute to favor self-interested whistleblowers who delay uncovering fraud for selfish gain over the more civic-minded whistleblowers, like Babalola and Adetunmbi, who reveal fraud to the government and assist in the government's investigation and prosecution at the soonest possible time?  *Compare United States v. Bank of Farmington,* 166 F.3d 853, 866 (7th Cir. 1999) (stating that the "intent" of the False Claims Act

---

[2] *See supra*, note 1.

is "to encourage private individuals who are aware of fraud against the government "to bring such information forward *at the earliest possible time* and to discourage persons with relevant information from remaining silent" (citation omitted)).

Although this result is arguably inequitable and illogical, it, nevertheless, appears mandated by the statute's text.  It bears consideration whether Congress truly intended and desires this policy.